5/21/2019 4:13 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-006888
Carrisa Stiles

Notice of Removal

**Exhibit**

**A-27**

## CAUSE NO. D-1-GN-18-006888

|  |  |  |
|---|---|---|
| MANCHESTER  TEXAS FINANCIAL | § | |
| GROUP, LLC; MANCHESTER AUSTIN, | § | |
| LLC d/b/a MANCHESTER AUSTIN | § | |
| HOTEL, LLC, as assignee of | § | **IN THE DISTRICT COURT** |
| MANCHESTER TEXAS FINANCIAL GROUP, | § | |
| LLC; and MANCHESTER FINANCIAL | § | |
| GROUP, LLC | § | |
|  | § | |
| *Plaintiffs,* | § | **126th JUDICIAL DISTRICT** |
|  | § | |
| VS. | § | |
|  | § | |
| THE CHUBB CORPORATION aka ACE | § | |
| AMERICAN INSURANCE COMPANY, | § | **TRAVIS COUNTY, TEXAS** |
| ALLIANT INSURANCE SERVICES, INC., and | § | |
| LOCKTON COMPANIES, LLC | § | |
|  | § | |
| *Defendants.* | § | |

## PLAINTIFFS' SECOND AMENDED PETITION

COME NOW, PLAINTIFFS, MANCHESTER TEXAS FINANCIAL GROUP, LLC;

MANCHESTER AUSTIN, LLC d/b/a MANCHESTER AUSTIN HOTEL, LLC, as assignee of

MANCHESTER TEXAS FINANCIAL GROUP, LLC; and MANCHESTER FINANCIAL

GROUP, LLC (hereinafter collectively referred to as "MANCHESTER") and file this Second

Amended Original Petition complaining of ACE AMERICAN INSURANCE COMPANY

(improperly named as "The CHUBB CORPORATION aka ACE AMERICAN INSURANCE

COMPANY"), and for cause of action would respectfully show unto the Court as follows:

### I.     DISCOVERY CONTROL PLAN

1. Pursuant to Texas Rule of Civil Procedure 190.4, Plaintiffs intend for discovery to be

conducted under Level 3 of the Discovery Control Plan.

## II.  **PARTIES**

2. Plaintiff MANCHESTER TEXAS FINANCIAL GROUP, LLC, is a Delaware limited liability company which is authorized to conduct business in the State of Texas and is conducting business in Texas.

3. Plaintiff, MANCHESTER AUSTIN, LLC d/b/a MANCHESTER AUSTIN HOTEL, LLC, as assignee of MANCHESTER TEXAS FINANCIAL GROUP, LLC, is a Delaware limited liability company which is authorized to conduct business in the State of Texas and is conducting business in Texas.

4. Plaintiff MANCHESTER FINANCIAL GROUP, LLC is a California limited liability company which is authorized to conduct business in the State of Texas.

5. Defendant, ACE AMERICAN INSURANCE COMPANY (improperly named as "THE CHUBB CORPORATION aka ACE AMERICAN INSURANCE COMPANY") (hereinafter "ACE"), is a foreign insurance carrier organized and existing under the laws of Pennsylvania and is authorized to conduct business, and is conducting business, in Texas. Upon information and belief, ACE may be served through its designated agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

## III.  **JURISDICTION**

6. This Court has jurisdiction over this matter because the amount in controversy exceeds the minimal jurisdictional limits of this Court.

7. This Court has jurisdiction over Defendant ACE because this Defendant engages in the business of insurance in the State of Texas and Plaintiffs' causes of action arise out of Defendant's business activities in Texas. Specifically, ACE's business engagements in Texas include, but are not limited to, the following: making and issuing contracts of insurance; taking

*Plaintiffs' Second Amended Petition*

or receiving applications for insurance; receiving or collecting premiums, commissions or other consideration; and delivering contracts of insurance to residents of Texas or to persons authorized to do business, and doing business, in the State of Texas.  TEX. CIV. PRAC. & REM. CODE §17.042.

## IV.    VENUE

8. Venue is proper in Travis County, Texas because the insured property giving rise to Plaintiffs' causes of action is situated in Travis County, Texas.  TEX. CIV. PRAC. & REM. CODE §15.032.

## V.    CLAIMS FOR RELIEF

9. In compliance with Texas Rule of Civil Procedure 47, Plaintiffs seek monetary relief over $1,000,000.

## VI.    BACKGROUND

10. On May 19, 2014, MANCHESTER TEXAS FINANCIAL GROUP, LLC (hereinafter "MTFG") engaged Hunt Construction Group, LLC (hereinafter "Hunt") as the General Contractor to build the Fairmont Austin, a 37-story luxury hotel, located at 101 Red River Street, Austin, Texas 78701. (hereinafter the "Project" or the "Hotel").  The contract documents between MTFG and Hunt consist of: AIA Document A133-2009 Standard Form of Agreement Between Owner and Construction Manager; a second signature page to the Contract executed by Michael Fratianni; a Guaranteed Maximum Price Amendment to the Contract; an Assignment and Assumption agreement between Plaintiffs MANCHESTER AUSTIN, LLC d/b/a MANCHESTER AUSTIN HOTEL, LLC and MANCHESTER TEXAS FINANCIAL GROUP, LLC; and AIA Document A201-2007 General Conditions to the Contract for Construction (hereinafter "General Conditions").

11. The initial final completion date for the Project was June 3, 2017; however, completion of the Project has been delayed due to various events, some of which are covered under MANCHESTER's insurance policies.

### *The Builder's Risk Policy*

12. Section 11.3 of the General Conditions in the contract documents executed between MANCHESTER and Hunt requires MANCHESTER, as the Owner, to purchase property insurance written on a builder's risk "all-risk" or equivalent policy form. The policy must cover: "perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, resultant damage from defective workmanship or design, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's and Contractor's services and expenses required as a result of such insured loss." Additionally, MANCHESTER must pay any deductibles.

13. MANCHESTER purchased, and ACE issued, an insurance policy under Construction Risk Coverage Form ACE0729 bearing Policy No. I08909726 001 (hereinafter "BUILDER'S RISK POLICY" or "BR POLICY"). The BR POLICY was initially effective November 5, 2014 through August 5, 2017, but was thereafter extended to December 31, 2017 pursuant to the Extension of Term provisions in the policy and agreement of the parties, with the exchange of reasonable consideration. A true and correct copy of the BR POLICY is attached hereto as **Exhibit "1"**. The BR POLICY insured the Project identified as the Fairmont Austin Convention Center Hotel, and lists Plaintiff MANCHESTER AUSTIN, LLC as the Named Insured. Additional Named Insureds include Plaintiffs MANCHESTER TEXAS FINANCIAL GROUP,

APP 0517

LLC and MANCHESTER FINANCIAL GROUP, LLC as well as Fairmont Austin Hotel, LLC and Hunt Construction Group/AECOM. The BR POLICY was entered into in the State of Texas by parties located in Texas for a Project to be built and work performed in Austin, Texas.

*Claims & Losses Under the BR POLICY*

14. The BR POLICY is an all-risk policy which "insures against direct physical LOSS to property of every kind and description intended to become a permanent part of, or be consumed in, the construction, fabrication, assembly, installation, erection or alteration of" the Project, subject to limited exclusions. *See* **Exhibit 1 at p.23**. In addition, coverage is afforded under various Endorsements made a part of the BR POLICY.

15. During the terms of the BR POLICY, MANCHESTER sustained covered losses, including but not limited to, physical loss or damage to insured property and the associated costs, expenses and delays caused thereby. ACE was timely and adequately notified of such losses and the covered damages according to the terms of the BR POLICY, and MANCHESTER requested coverage by ACE of all covered losses to which it is entitled.

16. Such insured losses include, but are not limited to, the following: (a) extraordinary rainfall in the spring of 2015 (Claim No. JY15J0313995) caused no less than $940,467 in covered damages resulting from de-watering, protection of property, extended general conditions expenses, etc.; (b) ground water intrusion in July 2015 (Claim No. JY17039588X) that resulted when the de-watering measures installed by the Contractor and/or Subcontractor to protect construction of the foundation and water cut-off wall failed to function, thereby causing covered damage to the in-process construction and requiring no less than $636,636 in repair and remediation expenses; (c) collapse of the portico on August 26, 2017 caused by the failure of the embedded hangers to which the portico was attached to the Hotel (Claim No. KY17K2219415)

resulting in covered damages to the portico of no less than $1,436,624; and (d) failure of the fire suppression standpipe on November 21, 2017 (Claim No. KY17K2396383), which caused extensive flooding of the Hotel and resulted in covered damages of no less than $9,972,556.64, which was paid in part by ACE leaving approximately $919,152.35 wrongfully unpaid.

17. By way of illustration and example only, as it relates to the portico claim (Claim No. KY17K2219415), in the early morning on August 26, 2017, the north portico over the main entrance to the Hotel fell to the ground. The portico was designed to withstand winds well in excess of 100 mph. Although Hurricane Harvey was active to the south and east, closer to Houston, records maintained by the National Oceanic and Atmospheric Administration reflect wind speeds of only 30 mph with occasional gusts up to 54 mph in Austin.

18. Investigations by ACE and others, including MANCHESTER, demonstrated the collapse occurred due to a failure of the welds in the structures embedded within the concrete columns of the Hotel to which the portico was attached. Those structures consisted of two steel plates joined by 20 large iron bars welded to the inside face of the plates.  The result was a unit that looked something like an "H" with flat plates for the vertical components and multiple iron bars for the cross members.  The embedded units were designed as a unit separate from the portico itself, which was attached separately to the outer face of the embedded hanger units. The embedded hangers were fabricated offsite and brought in their completed form to the Hotel where they were set in place in the forms for pouring of the concrete columns.  The cement was then poured into the column forms and the embedded units were thereby incorporated into the columns with the outer plate accessible to attach the portico.  The portico was bolted and welded to the exposed embed plate at a much later date.

19. After receiving timely notice, ACE opened Claim No. KY17K2219415 to evaluate

coverage for this event.  MANCHESTER provided ACE all requested information and allowed ACE unfettered access to the job site and records necessary to conduct its investigation.

20. After a lengthy delay without a coverage decision, on October 18, 2017, MANCHESTER again contacted ACE to request a coverage decision, which was ostensibly delayed by the overdue causation reports from ACE's metallurgist and engineer. Eventually ACE provided MANCHESETER a report regarding the event, which was prepared at its request by Wiss, Janney, Elstner Associates, Inc.  The report included no criticism of the construction or installation of the portico itself, but laid all of the blame on the embedded hangers.

21. On December 19, 2017, four months after receiving the initial notice of claim, ACE notified MANCHESTER that it would not cover the portico loss, even in part.  To be clear, when the hangers failed and the portico fell, it caused damage to doors, glass, and other elements of the Hotel, that were covered by ACE under a separate claim number.  MANCHESTER alleges no wrongdoing in connection with the payment of that separate claim.  In its evaluation of Claim No. KY17K2219415, however, ACE refused to apply the "Cost of Making Good" exclusion which would reduce the amount of the claim only by the cost necessary to prevent the loss had the causal deficiencies been identified before the loss.   In fact, the cost to remedy the deficiencies (inadequate welds and arguably improper design of the embed hanger units) was implemented by MANCHESTER before the portico was rebuilt and re-attached.  The "fix" necessary to "make good" the embed plates was simply drilling holes through the embed plates and column from one side of the column to the other, then passing treaded iron rods through the plates and column from side to side and applying a washer and bolt to each end.  By doing so, any deficiencies in the strength of the welds, the rigidity of the plates or the design were completely eliminated at a very low cost.

22. ACE's denial of coverage on the portico claim is not supported by the facts, the BR POLICY language, ACE's investigation, other investigations, the results of which were provided to ACE, or applicable law. ACE applied an unreasonable interpretation to the BR POLICY language and ignored the facts. Moreover, ACE acted knowingly and intentionally in denying coverage for a claim that was clearly covered.

23. Similar evidentiary facts with respect to each claim under the BR POLICY which ACE failed and refused to cover in full will be developed in discovery and proven at trial.

## VII.   NOTICE & CONDITIONS PRECEDENT

24. MANCHESTER has fully or substantially performed all acts necessary to perfect and establish all claims and causes of action asserted in this lawsuit.

25. All conditions precedent to MANCHESTER's right to recover on any of the claims and causes of action asserted in this lawsuit have been discharged, satisfied or fully performed.

## VIII.   CAUSES OF ACTION

## COUNT ONE:  NONCOMPLIANCE WITH THE TEXAS INSURANCE CODE: UNFAIR SETTLEMENT PRACTICES AGAINST ACE

26. Each of the foregoing allegations is incorporated fully herein by reference.

27. Without excuse or justification, ACE engaged in conduct, including affirmative acts and omissions that constitute multiple violations of Chapter 541 of the Texas Insurance Code. All violations under this article are made actionable by Texas Insurance Code § 541.151, and the damages sought are authorized pursuant to § 541.152.

28. ACE violated Texas Insurance Code § 541.060(a) by engaging in multiple unfair settlement practices, including but not limited to: (a) misrepresenting to Plaintiffs a material fact or policy provision relating to the coverage at issue; (b) failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of a claim after ACE's liability had become

*Plaintiffs' Second Amended Petition*                                                                 **8**

reasonably clear; (c) failing to promptly provide Plaintiffs a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for denial of a claim or offer of a compromise settlement of a claim; (d) failing within a reasonable time to affirm or deny coverage of a claim to Plaintiffs or submit a reservation of rights to Plaintiffs; and (e) refusing to pay claims without conducting a reasonable investigation with respect to such claims.

29. Each of the claims under the BR POLICY, which were denied in full or in part, or for which payment was delayed are in fact covered claims to which MANCHESTER is entitled to full payment. ACE knowingly and intentionally delayed payment, refused to make the full payment and/or denied payment in full on covered claims when it knew, or reasonably should have known, that it was reasonably clear that the claims were covered and it knew, or reasonably should have known, there was no reason to deny the claims, delay payments or reduce payments.

30. Further, MANCHESTER expressly notified ACE orally and in writing, and ACE independently knew or should have known that delays in payment or denial of payment created a high probability of dire financial and other consequences to the Project. These dire consequences include, but are not limited to: the potential for contractors dependent upon payment out of the proceeds of the covered claim to walk off the job; unnecessary and financially devastating delays in completion of the Hotel resulting in increased construction and related costs; loss of business revenue; and/or unsustainable financial burdens to MANCHESTER to make payments from its own funds.

31. Consequently, MANCHESTER is entitled to damages as set forth in Section 542.060 of the Texas Insurance Code for its covered losses under the BR POLICY, as follows: (a) Claim No. JY15J0313995 of no less than $940,467; (b) Claim No. JY17039588X of no less than $536,636; (c) Claim No. KY17K2219415 of no less than $1,436,624; and (d) Claim No.

APP 0522

KY17K2396383 of no less than $919,152.35, plus further and additional damages as may be proven at trial.

32. ACE's unreasonable, knowing and intentional violations of its contractual, common law and statutory duties were a direct, proximate and legal cause of damages to MANCHESTER. ACE is therefore liable to MANCHESTER for damages in the form of sums due under the insurance contract, compensatory damages for its tortious acts and omissions, three times actual damages, court costs, attorneys' fees, and punitive and exemplary damages upon proof at trial. TEX. INS. CODE § 541.152(a)(1).

## COUNT TWO:  NONCOMPLIANCE WITH THE TEXAS INSURANCE CODE: PROMPT PAYMENT OF CLAIMS AGAINST ACE

33.  Each of the foregoing allegations is incorporated fully herein by reference.

34. ACE engaged in conduct, including affirmative acts and omissions, that constitutes violations of Chapter 542 of the Texas Insurance Code by delaying and/or failing to timely pay MANCHESTER's covered losses and damages.

35.  Consequently, MANCHESTER is entitled to damages as set forth in § 542.060 of the Texas Insurance Code for its covered losses under the BR POLICY as follows: (a) Claim No. JY15J0313995 of no less than $940,467; (b) Claim No. JY17039588X July 2015 of no less than $636,636; (c) Claim No. JY17K2219415 August 26, 2017 of no less than $1,436,624; (d) Claim No. KY17K2396383 of no less than $919,152.35; and (e) additional damages as may be proven at trial.

36. ACE violated the prompt payment of claims provisions of the Texas Insurance Code, namely section 542.051 *et seq.*, by:

      a.   Failing, within 15 days of the notice of each claim, to acknowledge receipt of the claim in writing; begin an investigation; and request necessary documentation

from the insured which ACE reasonably believed would be required to reach a coverage decision, as required by TEX. INS. CODE § 542.056;

b. Failing to timely notify MANCHESTER in writing of its acceptance or rejection of the Claim, and to state the reasons for such denial, within the applicable time constraints provided by TEX. INS. CODE § 542.056; and/or

c. Delaying payment of the Claim following ACE's receipt of all items, statements, forms reasonably requested and required, longer than the amount of time provided by TEX. INS. CODE § 542.058.

37. Consequently, MANCHESTER is entitled to damages as set forth in § 542.060 of the Texas Insurance Code for its covered losses under the BR POLICY as follows: (a) Claim No. JY15J0313995 2015 of no less than $940,467; (b) Claim No. JY17039588X July 2015 of no less than $636,636; (c) Claim No. KY17K22194?5 August 26, 2017 of no less than $1,436,624; and (d) Claim No. KY17K2396383 of no less than $919,152.35; and (e) any additional damages as may be proven at trial.

38. Each of the claims under the BR POLICY, which were denied in full or in part, or for which payment was delayed are in fact covered claims to which MANCHESTER is entitled to full payment.  ACE knowingly and intentionally delayed payment, refused to make the full payment and/or denied payment in full on covered claims when it knew, or reasonably should have known, that it was reasonably clear that the claims were covered and it knew, or reasonably should have known, there was no reason to deny the claims, delay payments or reduce payments.

39. Each of the claims which were denied in full or in part, or for which payment was delayed under the BR POLICY, were in fact covered claims to which MANCHESTER is entitled to full payment. Further, each of the aforementioned unfair settlement practices was committed

knowingly and intentionally by ACE.

40. MANCHESTER expressly notified ACE orally and in writing, and ACE independently knew or should have known that delays in payment or denial of payment created a high probability of dire financial and other consequences to the Project.  These dire consequences include, but are not limited to: the potential for contractors dependent upon payment out of the proceeds of the covered claims to walk off the job; unnecessary and financially devastating delays in completion of the Hotel resulting in increased construction and related costs; loss of business revenue; and/or unsustainable financial burdens to MANCHESTER to make payments from its own funds.

41. ACE's unreasonable, knowing and intentional violations of its contractual, common law and statutory duties are a direct, proximate and legal cause of damages to MANCHESTER. ACE is therefore liable to Plaintiffs for damages in the form of sums due under the contract of insurance, compensatory damages for its tortious acts and omissions, three times the actual damages suffered by Plaintiffs; court costs and attorneys' fees; 18% annual interest on the damages awarded; and for any additional damages which may be proven at trial.

## COUNT THREE – VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT AGAINST ACE

42. Each of the foregoing allegations is incorporated fully herein by reference.

43. At all material times herein, MANCHESTER is a "consumer" which purchased insurance products and services from ACE, and such products and services form the basis of this cause of action.

44. MANCHESTER has a claim against ACE under the Texas Deceptive Trade Practices – Consumer Protection Act ("DTPA") based on its use and/or employment of acts or practices that violated Texas Insurance Code Chapter 541.  TEX. BUS. & COM. CODE § 17.50(a)(4).

45. ACE violated the DTPA in at least the following respects:

    a.   ACE represented the Policy confers or involves rights, remedies or obligations which it does not have, or involve, or which are prohibited by law;

    b.   ACE represented that goods, products or services had sponsorship, approval, characteristics, uses, benefits or quantities it does not have;

    c.   ACE failed to disclose information concerning goods or services which were known at the time of the transaction when such failure to disclose was intended to induce MANCHESTER into a transaction it would not have entered into had the information been disclosed;

    d.   ACE, by accepting insurance premiums but refusing without a reasonable basis to pay benefits due and owing, engaged in an unconscionable action or course of action prohibited by DTPA §17.50(a)(1)(3) in that ACE took advantage of MANCHESTER's lack of knowledge, ability, experience and capacity to a grossly unfair degree, resulting in a gross disparity between the consideration paid in the transaction and the value received, all in violation of Chapter 541 of the Texas Insurance Code;

    e.   Generally engaging in unconscionable courses of action while handling the claim; and/or

    f.   Violating the provisions of the Texas Insurance Code.

46. As a result of ACE's violations, MANCHESTER suffered actual damages, and such violations were a producing, actual and proximate cause of Plaintiffs' damages. Therefore, ACE is liable to Plaintiffs for their damages caused by violations of the DTPA, according to proof at the time of trial.

47. Each of the acts and omissions of ACE was carried out knowingly and intentionally and each claim which was denied in full or in part, or for which payment was delayed under the BR POLICY, was in fact a covered claim to which Plaintiffs are entitled to full payment. ACE failed to act as a reasonable insurer under the same or similar circumstances would have acted.

48. ACE's unreasonable, knowing and intentional violations of its contractual, common law and statutory duties were a direct, proximate and legal cause of damages to MANCHESTER. ACE is therefore liable to MANCHESTER for damages in the form of sums due under the insurance contract, compensatory damages for its tortious acts and omissions, treble damages, punitive and exemplary damages, and court costs as well as reasonable and necessary attorneys' fees pursuant to Texas Business & Commerce Code § 17.50(d).

## COUNT FOUR:  BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING AGAINST ACE

49. Each of the foregoing allegations is incorporated fully herein by reference.

50. ACE's conduct constitutes a breach of the common law duty of good faith and fair dealing owed to insureds in insurance contracts.  ACE's failure, as described above, to adequately and reasonably investigate and evaluate Plaintiffs' claims, under circumstances where ACE knew or reasonably should have known through the exercise of reasonable diligence, that liability was reasonably clear, constitutes a breach of the duty of good faith and fair dealing.

51. Specifically, ACE breached the common law duty of good faith and fair dealing owed to MANCHESTER by *inter alia* its acts and omissions including but not necessarily limited to:

    a.  Failing to promptly provide to MANCHESTER a reasonable explanation of the basis in the insurance policy, in relation to the facts or applicable law, for denial of the covered claims at issue;

    b.  Refusing to pay claims without conducting a reasonable investigation based upon

*Plaintiffs' Second Amended Petition*                                                                      **14**

all available information but instead conducting investigations calculated to construct a pretextual basis to deny the claims, relying on biased reports and ignoring facts and objective reports;

c.  In failing to perform, adopt or implement reasonable standards for prompt investigation of claims arising out of the above-referenced Policies;

d.  In not attempting in good faith to effectuate a prompt, fair and equitable settlement of each claim when ACE knew or reasonably should have known it was reasonably clear that the each respective claim was covered;

e.  In compelling MANCHESTER to retain counsel and file suit to recover amounts due under the Policy;

f.  In representing that insurance or insurance services are of a particular standard or quality when they are of another;

g.  In representing that the insurance policy confers or involves rights, remedies or obligations which it does not have or which are prohibited by law;

h.  In making or causing to be made a statement misrepresenting the terms, benefits or provisions of the insurance policy; and

i.  Engaging in false, misleading or deceptive acts or practices.

52.  ACE's acts and omissions in breach of the covenant of good faith and fair dealing were the direct, proximate and legal cause of damages to MANCHESTER including loss of opportunity to avoid injury, unnecessary delay in construction resulting in additional construction costs and loss of business revenue, financial costs to cover expenses and undertake repairs and rehabilitation of the Hotel which should have been paid for from benefits due to MANCHESTER under the Policies at issue, court costs, attorneys' fees and any other damages

according to proof at the time of trial.

### COUNT FIVE:  BREACH OF INSURANCE CONTRACT AGAINST ACE

53. Each of the foregoing allegations is incorporated fully herein by reference.

54. MANCHESTER purchased the subject BR POLICY and was a named insured thereunder.   At all times MANCHESTER met and performed all of its duties and obligations under the BR POLICY.

55. ACE was not excused from performance by any circumstance, act or law and was obligated to meet and perform each of its duties and obligations under the BR POLICY.

56. Without excuse or justification, ACE failed to perform its duties and obligations to MANCHESTER under the policy to promptly investigate claims and to pay claims in accordance with the Policy provisions.

57. As a result, numerous covered claims submitted by MANCHESTER were not paid at all, were paid only in part or were paid with excessive and unjustifiable delay, in breach of the terms of the insurance contract at issue.

58. ACE's breach of the contract was the direct, legal and proximate cause of damages to MANCHESTER, including loss of benefits due under the policies, foreseeable financial expenses and hardship caused by the need to pay for repair and rehabilitation to the Hotel out of MANCHESTER's funds when such expenses should have been paid from benefits received from ACE, delay in completion of the Hotel and foreseeable loss of business revenue caused thereby, and other damages according to proof at the time of trial.

### PRAYER

WHEREFORE, Plaintiffs MANCHESTER TEXAS FINANCIAL GROUP, LLC; MANCHESTER AUSTIN, LLC d/b/a MANCHESTER AUSTIN HOTEL, LLC, as assignee of

MANCHESTER TEXAS FINANCIAL GROUP, LLC; and MANCHESTER FINANCIAL GROUP, LLC pray that this Court find in their favor and award Plaintiffs the following relief:

(a)  Actual damages;

(b)  18% interest per annum;

(c)  Treble damages;

(d)  Reasonable and necessary attorneys' fees;

(e)  Expenses and costs of Court;

(f)  Pre-judgment and post-judgment interest at the highest rates permitted by law;

(g)  And all other relief, both at law and in equity to which Plaintiffs may show themselves to be justly entitled.


Dated:  April 21, 2019                                   Respectfully submitted,

**MAZZARELLA & MAZZARELLA, LLP**


By:   /s/ Angelle Adams
    **Angelle M. Adams**
    TX State Bar No. 24055081
    angelle@mazzarellalaw.com

    **Mark C. Mazzarella**
    CA State Bar No. 82494
    mark@mazzarellalaw.com
    (*admitted pro hac vice*)
    **Daral B. Mazzarella**
    CA State Bar No. 126864
    daral@mazzarellalaw.com
    (*admitted pro hac vice*)
    2550 Fifth Avenue, 9th Floor
    San Diego, CA  92103-6625
    (619) 238-4900 Telephone
    (619) 238-4959 Facsimile

Unofficial copy Travis Co. District Clerk Velva L. Price

LOCAL COUNSEL:

**David E. Dunham**
State Bar No. 06227700
TAYLOR DUNHAM, LLP
919 Congress Avenue, Suite 900
Austin, Texas 78701
(512) 473-2257

**ATTORNEYS FOR PLAINTIFFS
MANCHESTER TEXAS FINANCIAL
GROUP, LLC; MANCHESTER AUSTIN,
LLC d/b/a MANCHESTER AUSTIN
HOTEL, LLC, as assignee of
MANCHESTER TEXAS FINANCIAL
GROUP, LLC; and MANCHESTER
FINANCIAL GROUP, LLC**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 21, 2019, a copy of the foregoing document was served in accordance with the Texas Rules of Civil Procedure on all counsel of record.

<u>/s/ Angelle M. Adams</u>
Angelle M. Adams

Alicia G. Curran
Cozen O'Connor
1717 Main Street, Suite 3100
Dallas, Texas 75201-7335
acurran@cozen.com

Attorneys for Defendant Ace American Insurance Company

Sara Romine, Esq.
Carrington, Coleman, Sloman & Blumenthal, LLP
901 Main Street
Suite 5500
Dallas, TX 75202
SRomine@CCSB.com
Attorneys for Defendant Texas Series of Lockton Companies, LLC

John Mitchell Nevins, Esq.
Gordon & Rees
2200 Ross Avenue, Suite 4100 West
Dallas, TX 75201
jnevins@grsm.com
Attorneys for Defendant Alliant Insurance Services, Inc.

# Exhibit 1

# *Common Policy Declarations*



Policy Number: I08909726 001
Named Insured & Mailing Address:

**Manchester Austin, LLC**
**350 Camino De La Reina**
**San Diego, CA 92108**

Company Name: ACE American Insurance Company
Producer's Name & Address:

**ALLIANT INSURANCE SERVICES**
**701 B STREET**
**SAN DIEGO, CA 92101**
**304192 - New**

| General Policy Information | | |
|---|---|---|
| Business Description: | **Construction Risk** | |
| When Coverage Begins: | **11/05/2014** | 12:01 A.M. Local Time at Named Insured's Address |
| When Coverage Ends: | **08/05/2017** | 12:01 A.M. Local Time at Named Insured's Address |

**In return for the payment of premium, and subject to all the terms and conditions of this policy, we agree to provide the insurance as stated in this policy.**

The premium for this policy is indicated below next to the applicable Coverage Form(s).

*Coverage Form*

| | |
|---|---|
| **Construction Risk Coverage Form ACE0728 (10/13)** | $ 515,646 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| **Total Premium:** | $ 515,646 |
| **Total Assessments, Fees, Surcharges, Taxes:** | $ 0 |
| **Total Amount Due:** | $ 515,646 |
| Minimum Earned Premium: | $ 103,129 |

**Attached Forms Information**

See Forms Schedule CPfs2

**Authorization Information**

Date: 11/24/2014

JOHN J. LUPICA, President
Authorized Representative

**These Declarations together with the Coverage Declarations, Common Policy Conditions and Coverage Conditions (if applicable), Coverage Form(s) and Forms and Endorsements, if any, issued to form a part thereof, complete the above numbered policy.**

APP 0534

# *Forms Schedule*

Company: ACE American Insurance Company
SYM:   **IMC**                              Policy ID: **I08909726 001**

| **Policy Period** | When Coverage Begins: | **11/05/2014** | 12:01 A.M. Local Time At Named Insured's Address |
|---|---|---|---|
| | When Coverage Ends: | **08/05/2017** | 12:01 A.M. Local Time At Named Insured's Address |

| **Applicable to all Coverage Parts** | Form No. and Description<br>**BB-5W58a (09/11)-Common Policy Declarations**<br>**ALL-21101 (11/06)-Trade or Economic Sanctions Endorsement**<br>**IL 02 70 (09/12)-California Changes - Cancellation And Nonrenewal**<br>**ALL-20887 (10/06)-ACE Producer Compensation Practices & Policies**<br>**IL P 001 (01/04)-U.S. Treasury Departments' Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders**<br>**CC-1K11h (03/14)-Signatures** |
|---|---|
| **Commercial Inland Marine** | Form No. and Description<br>**ACE0727 (10/13)-Construction Risk Declarations**<br>**ACE0728 (10/13)-Construction Risk Coverage Form**<br>**ACE0210 (01/08)-Nuclear, Biological, Chemical, Radiological Exclusion**<br>**ACE0729 (10/13)-Delay In Opening Endorsement**<br>**ACE0731 (10/13)-Rain, Sleet, Ice Or Snow Coverage Endorsement**<br>**IL 01 04 (09/07)-California Changes**<br>**IL 09 53 (01/08)-Exclusion of Certain Acts of Terrorism**<br>**TRIA15c (01/08)-Policyholder Disclosure Notice of Terrorism Insurance Coverage**<br>**ACE0768 (10-13) - Escalation Clause Endorsement**<br>**ACE0769 (10-13) – Ordinance Or Law Coverage Endorsement**<br>**ACE0724 (06/12)-ACE Inland Marine - Important Notice Notification of Claims** |

Unofficial copy Travis Co District Clerk Veva L. Price

Form CPfs2 (12/10)



## CONSTRUCTION RISK DECLARATIONS

SYM:  IMC       Policy ID:  I08909726 001

Company Name:  ACE American Insurance Company

NAMED INSURED & Mailing Address

Manchester Austin, LLC
350 Camino De La Reina
San Diego , CA   92108

Producer's Name & Address

ALLIANT INSURANCE SERVICES
701 B STREET
SAN DIEGO, CA   92101
304192

**General Policy Information**

When Coverage Begins:          **11/05/2014**     12:01 A.M. Local Time at the NAMED
                                                                            INSURED's Address

When Coverage Ends:            **08/05/2017**     12:01 A.M. Local Time at the NAMED
                                                                            INSURED's Address

**In return for the payment of premium and subject to all the terms and conditions of this Policy, the Company agrees to provide the insurance as stated in this Policy.**

Whenever "NCP" is shown below it denotes no coverage has been purchased and no coverage is provided.  Whenever "NA" is shown below it denotes "Not Applicable" to that coverage, deductible, Sub-limit of Insurance, or other policy provision.

## I.  Description, Location and Estimated Completed Value of the INSURED PROJECT at Policy Inception

A.  Estimated construction contract price: **$298,104,060**

B.  Value of all property not declared in A. above to be insured by this Policy and intended for installation under the construction contract, whether supplied by the INSURED PROJECT owner(s) or others(s): **Not Applicable**

C.  Estimated Completed Value of the INSURED PROJECT at Policy Inception: **$298,104,060**

D.  INSURED PROJECT Name:   **Fairmont Austin Convention Center Hotel**

E.  Contract Number: **Not Applicable**

F.  INSURED PROJECT Description/Construction: **Ground up construction - 36-stories above
                                                                            ground / 4-levels below ground fire resistive
                                                                            high-rise hotel building**

G.  INSURED PROJECT Site:            **101 Red River St., Austin, TX 78702**

## II. Limits of Insurance

$  **356,027,843**     (**100** %)     part of  $  **356,027,843**          Per OCCURRENCE

The Company will pay no more for direct physical LOSS in any one OCCURRENCE than the above Limit of Insurance.  In addition, the Company will not pay for more than its proportionate share (**100** %) of the following Sub-limits of Insurance and Annual Aggregate Sub-limits of Insurance, which are part of, and not in addition to, the Limit of Insurance above:

Unofficial copy from Travis Co District Clerk Velva L. Price



**Sub-limits of Insurance**

| | | |
|---|---|---|
| A. Physical LOSS to the INSURED PROJECT | $ | 298,104,060 |
| B. Delay in Opening (per Form Number ACE0729) | $ | Per ACE0729 |
| C. EXISTING PROPERTY | $ | Not Covered |
| D. TRANSMISSION AND DISTRIBUTION LINES | $ | 250,000 |
| E. Property in Transit per Conveyance | $ | 7,500,000 |
| F. Temporary Off-site Storage and Off–site Staging Areas, any one location | $ | 7,500,000 |
| G. Expediting and Extra Expenses | | 20% of the insured physical LOSS, or $1,000,000  ; whichever is less |
| H. Debris Removal | | 25% of the insured physical LOSS, or $89,000,000  ; whichever is less |
| I. Trees, Shrubs and Plants | $ | 500,000 |
| J. Protection Service Charges | $ | 500,000 |
| K. Fire Protective Equipment Recharge | $ | 500,000 |
| L.. Valuable Papers and Records | $ | 500,000 |
| M. Claim Preparation Expenses | $ | 100,000 |
| N. Protection of Insured Property Pre-LOSS | $ | 250,000 |
| O. Architects and Engineers Fees | $ | 500,000 |
| P. Office and Construction Trailers/Semi trailers and their Contents | $ | 250,000 |
| Q. Ordinance or Law | $ | See ACE0769 |
| R. HOT TESTING | $ | Included |
| S. Furniture and Fixtures | $ | Included in Item A on Page 2 |
| T. Contract Penalty | | Not Covered |
| U. NAMED WINDSTORM | | 356,027,843 |

**Annual Aggregate Sub-limits of Insurance**

**If a Sub-limit of Insurance is shown below for FLOOD or EARTH MOVEMENT, the applicable Excluded Cause of LOSS contained in the Construction Risk Coverage Form is deleted.**

| | | | |
|---|---|---|---|
| A. FLOOD | Per OCCURRENCE | $ | 100,000,000 |
| | Annual Aggregate | $ | 100,000,000 |
| B. EARTH MOVEMENT | Per OCCURRENCE | $ | 100,000,000 |
| | Annual Aggregate | $ | 100,000,000 |
| C. Pollution or | Per OCCURRENCE | $ | 250,000 |
| Contamination Clean-Up | Annual Aggregate | $ | 250,000 |
| D. Limited Coverage for FUNGUS, Wet Rot, Dry Rot or Bacteria | Per OCCURRENCE | $ | 100,000 |
| | Annual Aggregate | $ | 100,000 |

Copyright 2013



**III. Deductibles**  $  **50,000** direct physical LOSS in any one OCCURRENCE except;

A. LOSS in any one OCCURRENCE caused by
   or resulting from FLOOD                                        $        **50,000**

   Subject to a maximum deductible of:                                  **Not Applicable**

B. LOSS in any one OCCURRENCE caused by
   or resulting from EARTH MOVEMENT                               $        **50,000**

   Subject to a maximum deductible of:                           $  **Not Applicable**

C. LOSS  in any one OCCURRENCE

   caused by or resulting from WATER DAMAGE                       $        **50,000**

   Subject to a maximum deductible of:                           $  **Not Applicable**

D. LOSS in any one OCCURRENCE caused by
   or resulting from NAMED WINDSTORM                              $        **50,000**

   Subject to a maximum deductible of:                           $  **Not Applicable**

E. LOSS in any one OCCURRENCE
   caused by or resulting from HOT TESTING                        $        **50,000**

**IV. Rates and Adjustment**

| Coverage Type | Rate | | Term Deposit |
|---|---|---|---|
| INSURED PROJECT Physical LOSS | $ **0.138** | Per $100 **Term** | $ **411,383** |
| Delay in Opening | $ **0.180** | Per $100 **Term** | $ **104,263** |
| HOT TESTING (days) | $ **Included** | Per $100 **Term** | $ **Included** |
| HOT TESTING (days) Delay in Opening | $ **Included** | Per $100 **Term** | $ **Included** |
| Total Deposit Premium | | | $ **515,646** |

Subject to a minimum earned premium of $ **103,129**



| | |
|---|---|
| **V. Extension of Term** | This Policy may be extended for a period not to exceed **ninety (90)** days from the original expiration date shown above, subject to the same terms and conditions in effect at the time of the extension, and subject to a pro-rata additional premium, exclusive of HOT TESTING. |
| | The HOT TESTING PERIOD may be extended for a period not to exceed **ninety (90)** days from the number of days for HOT TESTING stated in IV. Rates and Adjustment above, subject to the same terms and conditions in effect at the time of the extension, and subject to an additional premium based upon the number of days of the extension period. |
| | The NAMED INSURED must request these extensions in writing and receive acceptance from the Company prior to the original expiration date of this Policy. If the NAMED INSURED does not provide the aforementioned written extension request(s), coverage provided hereunder shall terminate on the original expiration date stated in this Policy. |
| **VI. Additional NAMED INSURED Information** | **Fairmont Austin Hotel, LLC** <br> **Manchester Texas Financial Group, LLC** <br> **Manchester Financial Group, LLC** <br> **Hunt Construction Group / AECOM** |
| **VII. Mortgagee and Loss Payee Information** | **To Be Advised** |
| **VIII. Attached Forms Information** | - |

**Date:    11/24/2014**

_____
                                                      **Authorized Representative**

Unofficial copy Travis Co. District Clerk Velva L. Price



# CONSTRUCTION RISK COVERAGE FORM

Words and phrases that appear in CAPITALS are defined in this Policy.   Refer to PART F. DEFINITIONS section in this Policy.

## PART A
## INSURING AGREEMENT

This Policy, subject to the terms, conditions and exclusions stated herein or endorsed hereto, insures against direct physical LOSS to property of every kind and description intended to become a permanent part of, or be consumed in, the construction, fabrication, assembly, installation, erection or alteration of the INSURED PROJECT, as described on the Declarations and for which values have been declared and deposit premium paid. If not covered by other insurance and if values have been declared to the Company for deposit premium calculation, this Insuring Agreement shall include coverage for TEMPORARY STRUCTURES.

## PART B
## LIMITS OF INSURANCE

The Company will pay no more for direct physical LOSS in any one OCCURRENCE than the amount stated on Section II. of the Declarations, subject to the following:

1.     Sub-limits of Insurance

       The Company will pay no more for direct physical LOSS in any one OCCURRENCE than the Sub-limit of Insurance stated on Section II of the Declarations for each applicable Coverage or Extension of Coverage.

2.     Annual Aggregate Sub-limits of Insurance

       Notwithstanding the foregoing, and irrespective of the stated Limit of Insurance or Sub-limits of Insurance on the Declarations, the most the Company will pay for direct physical LOSS in any one OCCURRENCE, and in the aggregate for direct physical LOSS from all OCCURRENCES in any one Policy year for all Coverage(s) and Extension of Coverage in or endorsed on this Policy, including the Delay in Opening Coverage, is the Annual Aggregate Sub-limit(s) of Insurance stated on the Declarations.

These Sub-limits of Insurance and Annual Aggregate Sub-limits of Insurance are part of, and not in addition to, the Limit of Insurance per OCCURRENCE stated on the Declarations.

## PART C
## EXTENSIONS OF COVERAGE

This Policy, subject to all the terms, conditions and exclusions stated herein or endorsed hereto, is extended to insure the following extensions of coverage if a dollar value is stated in the applicable Sub-limit(s) of Insurance or Annual Aggregate Sub-limit(s) of Insurance on the Declarations.

1.     Property in Transit

       Property in due course of transit that is intended to become a permanent part of, or be consumed in the INSURED PROJECT and subject to the following additional conditions:

       A.   Coverage shall attach upon commencement of loading and cease upon completion of unloading.

       B.   No coverage is provided for airborne shipments.



C.   No coverage is provided for waterborne shipments except on coastal and inland waterways.

D.   This extension of coverage shall be void if the NAMED INSURED enters into any   agreement with a carrier, releasing them from their common law or statutory liability or agreeing that this Policy shall in any way inure to the benefit of such carriers. However, the NAMED INSURED may, without prejudice to this extension of coverage, accept such bills of lading, receipts, or contracts of transportation as are ordinarily issued by carriers containing a limitation as to the value of insured property.

2.   Temporary Off-Site Storage and Off-Site Staging Areas

Property to be used in, or incidental to, completion of the INSURED PROJECT while located in temporary off-site storage or off-site staging areas away from the INSURED PROJECT site anywhere within the Policy territory, excluding property located at the manufacturer's or supplier's site or while in due course of transit if such equipment is the property of, or in the care, custody and control of a manufacturer or supplier.

3.   Expediting and Extra Expenses

In the event of direct physical LOSS insured hereunder, and occurring during the Policy period, the Company will pay for the reasonable and necessary extra costs to make temporary repairs, and to expedite the permanent repair or replacement of the insured property which is damaged by an insured peril; including additional wages for overtime, night work, and work on public holidays and the extra costs of express freight or other rapid means of transportation. In addition, the Company will pay for the reasonable and necessary Extra Expense incurred during the period of restoration and repair that are over and above the total costs that would normally have been incurred during the same period of time had no direct physical LOSS occurred. Extra Expense shall include equipment rental, emergency expenses, temporary use of property, demobilization and remobilization of equipment and facilities and other expenses necessarily incurred to reduce LOSS; excluding however, any coverage provided by the Delay in Opening Endorsement if endorsed to this Policy.

4.   Debris Removal

The Company will pay the expense incurred in the removal of debris of the damaged insured property under this Policy, as a result of direct physical LOSS to insured property by an insured peril.

The Company will not pay the expense to:

A.   Extract CONTAMINANTS OR POLLUTANTS from the debris; or

B.   Extract CONTAMINANTS OR POLLUTANTS from land or water; or

C.   Remove, restore or replace contaminated or polluted land or water; or

D.   Remove or transport any property or debris to a site for storage or decontamination required because the property or debris is affected by CONTAMINANTS OR POLLUTANTS whether or not such removal, transport, or decontamination is required by law or regulation.

It is a condition precedent to recovery under this extension of coverage that the Company shall have paid or agreed to pay for direct physical LOSS to the insured property hereunder, and that the NAMED INSURED shall give written notice to the Company of intent to claim for cost of removal of debris not later than twelve months after the date of such direct physical LOSS.

5.   Trees, Shrubs and Plants

The Company will pay for direct physical LOSS by an insured peril to trees, shrubs and plants, which are part of the INSURED PROJECT, and which have been installed, are in the process of being installed or awaiting installation at the INSURED PROJECT site.



6.      Protection Service Charges

When a fire department, police department or other governmental authority is called to save or protect insured property from direct physical LOSS by an insured peril, the Company will pay the charges that result from:

A.   A written contract or agreement signed prior to the direct physical LOSS; or

B.   Required by local ordinance.

7.      Fire Protective Equipment Recharge

The Company will pay for the cost to recharge or refill any fire protective equipment owned, in the control of, or used to protect insured property of the NAMED INSURED, when discharged:

A.   To prevent or control direct physical LOSS by an insured peril;

B.   Accidentally; or

C.   As a result of malfunction of the equipment.

In respect of items B. and C. above, the Company will pay for amounts in excess of amounts recoverable under any manufacturer's or supplier's warranty.

8.      Valuable Papers and Records

The Company will pay the cost incurred by the NAMED INSURED to research, replace, restore, or copy those valuable papers, records, documents, blueprints, plans or drawings that are directly related to the INSURED PROJECT, as a result of direct physical LOSS by an insured peril.

9.      Claim Preparation Expenses

The Company will pay reasonable expenses incurred by the NAMED INSURED for preparing and certifying details of a claim, resulting from a direct physical LOSS which would be payable under this Policy, provided that the total amount of the direct physical LOSS exceeds the applicable Deductible. Claim Preparation Expenses do not include fees or expenses of general public adjusters, lawyers, or representatives or employees of any broker or agent, and do not include salary or wages of employees of the NAMED INSURED or any of its affiliates.

10.     Protection of Insured Property Pre-LOSS

If it is necessary to move insured property from an INSURED PROJECT site, off-site storage location or off-site staging area to preserve and protect it from imminently sustaining direct physical LOSS by an insured peril, the Company will cover direct physical LOSS to that property while in transit or while temporarily stored at another location.

The NAMED INSURED must tell the Company about the removal within fifteen (15) days of first moving such insured property or no coverage will apply to the removed property.

11.     Architects and Engineers Fees

In the event of direct physical LOSS by an insured peril and occurring during the Policy period, the Company will pay necessary and reasonable compensation for architect's and engineer's services and expenses incurred by the NAMED INSURED in connection with the repair or replacement of the



INSURED PROJECT, but excluding any costs relating to improvements and betterments to any insured property.

This extension of coverage shall not apply to and shall not modify, amend or alter the Delay in Opening Architect and Engineers Fees Coverage when a value is stated and endorsed to this Policy.

12.   Office and Construction Trailers/Semi-trailers and their Contents

The Company will pay for direct physical LOSS to office and construction trailers, semi-trailers and their contents, owned by the NAMED INSURED or in the NAMED INSURED's care, custody or control while in, on or within 1,000 feet of the INSURED PROJECT site.

This coverage includes furniture, fixtures, data processing equipment, fax systems and phone systems but this extension of coverage does not apply to direct physical LOSS to tools or other contractor's equipment, jewels, jewelry, watches, money, stamps, deeds, letters of credit, documents, tickets, plans, blueprints, specifications or other valuable papers.

This Policy is excess over any other valid or collectible insurance available to the owner of the property.

13.   Ordinance or Law

If the repair of direct physical LOSS to insured property caused by an insured peril becomes subject to the enforcement of any ordinance or law that is in force at the time of direct physical LOSS and that:

A.   Requires the demolition of parts of the undamaged insured property; or

B.   Regulates the construction or repair of damaged insured property;

then the Company will pay for:

1.   The cost of demolishing the undamaged insured property and clearing the site of debris from such demolition; and

2.   The value of such undamaged part of the insured property which must be demolished; and

3.   The increased cost of repair and/or reconstruction of the damaged and undamaged insured property on the same site and limited to the minimum requirements of such ordinance or law regulating the repair or reconstruction of the damaged insured property on the same site. However, the Company will not pay for any increased cost of repair or reconstruction unless the damaged insured property is actually rebuilt or replaced.

The Company will not pay the following costs:

i.    Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any ordinance or law regulating asbestos or other hazardous material;

ii.   Cost of any governmental direction or request declaring that asbestos or other hazardous material present in, part of or utilized on any damaged or undamaged portion of insured property that can no longer be used for the purpose for which it was intended or installed and must be removed, modified or abated;

iii.  Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any ordinance or law regulating CONTAMINANTS OR POLLUTANTS; or



    iv.  Cost of compliance with the enforcement of any ordinance or law which the NAMED INSURED or owner would have otherwise been required to comply by nature of such ordinance or law in the absence of any direct physical LOSS covered by this Policy.

14.    HOT TESTING

The Company will pay for direct physical LOSS to insured property by an insured peril while such property is undergoing HOT TESTING during the HOT TESTING PERIOD.

Each of the following is a condition precedent to coverage for HOT TESTING.

A.  All specified protective materials, systems and instrumentation are installed, activated and operational.

B.  No supervisory or safety system has been deliberately circumvented, unless such circumvention is necessary for the conduct of testing activities as recommended by written testing procedures and/or manufacturer's specifications and provided that such circumvention does not extend beyond that necessary for conduct of said individual activities.

15.    Furniture and Fixtures

The Company will pay for direct physical LOSS by an insured peril to furniture and fixtures placed or installed in the INSURED PROJECT.  This property is insured while awaiting installation, during installation and after installation but only on the INSURED PROJECT site.

16.    Contract Penalty

The Company will pay applicable contract penalties for non-completion of the INSURED PROJECT which the NAMED INSURED is required to pay as a direct result of direct physical LOSS to insured property by an insured peril.  The penalties must be specified in the construction contract, signed prior to the start of construction.

This extension of coverage shall not apply to and shall not modify, amend or alter the Delay in Opening Coverage when a value is stated and endorsed to this Policy.

17.    Reward

At the Company's option, the NAMED INSURED may be reimbursed for rewards paid, other than to the NAMED INSURED, or any of the NAMED INSURED's partners, members, managers or officers, for information leading to the conviction of any one or more persons responsible for LOSS insured under this Policy. The Company will be the sole judge as to the payment and amount of the reimbursement.

The most the Company will pay in any one OCCURRENCE under this Extension of Coverage is $15,000.

18.    Pollution or Contamination Clean-Up

The Company will pay necessary and reasonable expenses incurred by the NAMED INSURED to clean-up and remove CONTAMINANTS OR POLLUTANTS from land or water confined to the INSURED PROJECT site(s) if the release, discharge or dispersal is caused by or results in direct physical LOSS that occurs during the Policy period, and which is not excluded by this Policy.

The Company will not pay for the costs to test for, monitor or assess the existence, concentration or effects of CONTAMINANTS OR POLLUTANTS except for testing which is performed in the course of clean-up and removal of the CONTAMINANTS OR POLLUTANTS from the land or water.

No liability shall exist under this provision unless such expenses are reported to the Company within 180 days of the date of direct physical LOSS.



19.    Limited Coverage for FUNGUS, Wet Rot, Dry Rot or Bacteria

A.    The coverage described below in B. only applies when FUNGUS, wet rot, dry rot or bacteria results directly from an OCCURRENCE that is covered by this Policy, which takes place during the policy period and only if all reasonable means were used to save and preserve the property from further LOSS at the time of and after that OCCURRENCE.

B.    Under this Extension of Coverage, the Company will pay for:

1.    Direct physical LOSS to insured property at the INSURED PROJECT caused by FUNGUS, wet rot, dry rot or bacteria, including the cost of removal of the FUNGUS, wet rot, dry rot or bacteria;

2.    The cost to tear out and replace any part of a building or other insured property as needed to gain access to FUNGUS, wet rot, dry rot or bacteria covered by this Endorsement; and

3.    The cost of testing performed after removal, repair, replacement or restoration of the damaged insured property is completed, provided there is a reason to believe that FUNGUS, wet rot, dry rot or bacteria are present.

C.    The coverage provided herein does not increase any other applicable Limit of Insurance or Sub-limit of Insurance for the INSURED PROJECT. If a particular OCCURRENCE results in LOSS by FUNGUS, wet rot, dry rot or bacteria, as well as other LOSS, the Company will not pay more, for the total of all LOSS, than the applicable Limit of Insurance per OCCURRENCE stated on the Declarations.

If there is covered LOSS to the INSURED PROJECT, not caused by FUNGUS, wet rot, dry rot or bacteria, loss payment will not be limited by the terms of this Extension of Coverage, except to the extent that FUNGUS, wet rot, dry rot or bacteria causes an increase in the LOSS. Any such increase in the LOSS will be subject to the terms of this Extension of Coverage.

**PART D**
**EXCLUSIONS**

**Property Excluded**

This Policy does not insure:

1.    Land and land values and the value of cut, fill and backfill materials existing at the INSURED PROJECT site prior to project commencement; however, to the extent included in the contract bid documents and declared for premium purposes, the value of fill and backfill materials purchased for use in the completion of the INSURED PROJECT is not excluded.

Notwithstanding the foregoing, labor and material charges incurred to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured in the foregoing, are covered to the extent such charges are included in the contract bid documents and declared for premium purposes;

2.    Construction tools and equipment;

3.    Vehicles or equipment licensed for highway use, watercraft or aircraft;

4.    Railroad rolling stock;

5.    Water, animals of any kind, standing timber, and growing crops;



6.   Accounts, bills, currency, stamps, deeds, evidence of debt, checks, money, securities, or other property of a similar nature;

7.   EXISTING PROPERTY at the INSURED PROJECT site, unless the value of same is declared to the Company and if a Sub-limit of Insurance is shown on the Declarations;

8.   Property at locations other than at the INSURED PROJECT site, except Property that is in Transit or at Temporary Off-site Storage and Off-site Staging Areas if a Sub-limit of Insurance is shown on the Declarations;

9.   Prototype, developmental, used machinery and equipment or any catalysts while undergoing any form of HOT TESTING;

10.  Refractory linings and brickwork during HOT TESTING from the time of the first application of heat, unless LOSS directly results from physical LOSS to other insured property by an insured peril;

11.  TRANSMISSION AND DISTRIBUTION LINES, unless the value of same is declared to the Company and if a Sub-Limit of Insurance is shown on the Declarations.

12.  Any property while located at any site which stores, processes or otherwise handles or makes use of radioactive materials unless reported to and accepted by the Company.  The foregoing shall not apply to locations or property making use of radioactive isotopes contained within equipment used for diagnostic or testing purposes.

### Excluded Causes of LOSS

**This Policy does not insure LOSS caused directly or indirectly by any of the following, and such LOSS is excluded regardless of any other cause or event that contributes concurrently, or in sequence to the LOSS:**

1.   A.   Hostile or warlike action in time of peace or war, including action in hindering, combating, or defending against an actual, impending, or expected attack:

      1.   By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces; or

      2.   By military, naval, or air forces; or

      3.   By an agent of any such government, power, authority, or forces; it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission or fusion will be conclusively presumed to be such a hostile or warlike action by such government, power, authority or forces;

   B.   Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating, or defending against such occurrence.

2.   LOSS, damage, costs, expenses, fines or penalties incurred or sustained by or imposed on any NAMED INSURED at the order of any government agency, court or authority arising from any cause whatsoever, except physical destruction of insured property by order of public authority to prevent spread of fire or explosion.

3.   Nuclear reaction or radiation or radioactive contamination however caused.  If fire ensues, liability is specifically assumed for direct physical LOSS by such ensuing fire, but not including any direct physical LOSS due to nuclear reaction, nuclear radiation or radioactive contamination.

Copyright 2013



4.    Dishonest or criminal act committed by:

    A.  the NAMED INSURED or of any of the NAMED INSURED's partners, employees, directors, trustees, or authorized representatives;

    B.  a manager or a member, or their partners, employees, directors or authorized representatives, if the NAMED INSURED is a limited liability company;

    C.  anyone else with an interest in the insured property, or their employees or representatives; or

    D.  anyone else to whom the insured property in entrusted for any purpose.

This Excluded Cause of LOSS applies whether or not such persons are acting alone or in collusion with other persons or such acts occur during the hours of employment.

This Excluded Cause of LOSS does not apply to insured property that is entrusted to others who are carriers for hire or to acts of destruction by employees of the NAMED INSURED.  But theft by employees of the NAMED INSURED is excluded.

5.    Shortage found upon taking inventory.

6.    Mysterious Disappearance.

7.    Infestation, disease, freeze, drought and hail, weight of ice or snow or any damage caused by insects, vermin, rodents or animals, but only as respects Trees, Shrubs and Plants.

8.    Consequential loss, damage or expense of any kind or description including but not limited to loss of market or delay, liquidated damages, performance penalties, penalties for non-completion, delay in completion, or non compliance with contract conditions, whether caused by a peril insured or otherwise;

This Excluded Cause of LOSS does not apply to the extent coverage is provided in the EXTENSIONS OF COVERAGE – Contract Penalty nor shall it exclude Delay in Opening Coverage when endorsed to this Policy.

9.    LOSS covered under any written or implied guarantee or warranty by any manufacturer or supplier.

10.   Asbestos Hazard:

    A.  Asbestos material removal unless the asbestos itself is damaged by fire, lightning, aircraft impact, explosion, riot, civil commotion, smoke, vehicle impact, windstorm or hail, vandalism, malicious mischief, leakage or accidental discharge from automatic fire protective systems.

    B.  Demolition or increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating asbestos material.

    C.  Any governmental direction or request declaring that asbestos material present in or part or utilized on any undamaged portion of the insured property can no longer be used for the purpose for which it was intended or installed and must be removed or modified.

11.   LOSS caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS OR POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this Policy.

Nevertheless, if fire is not excluded from this Policy and a fire arises directly or indirectly from the release, discharge, escape or dispersal of CONTAMINANTS OR POLLUTANTS, any covered LOSS which arises directly from that fire shall (subject to the terms, conditions and limitations of this Policy) be insured.



This Excluded Cause of LOSS shall not apply when LOSS is directly caused by fire, lightning, aircraft impact, explosion, riot, civil commotion, vandalism, malicious mischief, smoke, vehicle impact, windstorm or hail.  This Excluded Cause of LOSS shall also not apply when LOSS is directly caused by leakage or accidental discharge from automatic fire protective systems.

12.   The increased cost to comply with the enforcement of any ordinance or law that:

A.   Requires the demolition of parts of undamaged insured property;

B.   Regulates the construction or repair of damaged insured property;

This Excluded Cause of LOSS does not apply to the extent coverage is provided in the EXTENSIONS OF COVERAGE – Ordinance or Law.

13.   LOSS, destruction, distortion, erasure, corruption, alteration, diminishment in value, or loss of use or usefulness of:

A.   ELECTRONIC DATA by any cause whatsoever (including but not limited to COMPUTER VIRUS); and/or

B.   ELECTRONIC MEDIA caused by or resulting from the LOSS, destruction, distortion, erasure, corruption, alteration, diminishment in value, or loss of use or usefulness of ELECTRONIC DATA;

regardless of any other cause or event that contributes concurrently or in any sequence to the LOSS, damage, destruction, distortion, erasure, corruption, alteration, diminishment in value, or loss of use or usefulness of ELECTRONIC DATA or ELECTRONIC MEDIA.

This Excluded Cause of LOSS does not apply to LOSS of ELECTRONIC DATA or ELECTRONIC MEDIA caused by or resulting from the perils of Fire, Explosion, Riot and Civil Commotion, Vehicles and Aircraft Impact or Collision, Sonic Boom, Sprinkler Leakage, Sinkhole Collapse, FLOOD, EARTH MOVEMENT or Volcanic Action, if, and to the extent, such peril causing the LOSS is otherwise covered by this Policy.

14.   Any LOSS or expense consisting of, caused by, contributed to, or aggravated by FUNGUS, wet rot, dry rot or bacteria, whether directly or indirectly the result of an insured peril.  This includes, but is not limited to, the cost for investigation, testing, remediation services, extra expense or business interruption. Such LOSS is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the LOSS.

If LOSS otherwise covered by this Policy occurs, and the cost of removal of debris is increased due to the presence of FUNGUS, wet rot, dry rot or bacteria, this Policy will only be liable for the costs of debris removal which would have been incurred had no such factors been present in, on, or about the insured property to be removed.

This Excluded Cause of LOSS does not apply to the extent coverage is provided in the EXTENSIONS OF COVERAGE – Limited Coverage for FUNGUS, Wet Rot, Dry Rot or Bacteria.

15.   Rain, sleet, ice or snow, all whether driven by wind or not, entering the interior of any insured property, unless:

A. The exterior of insured property is complete; and

B. Only if the exterior of insured property first sustains direct physical LOSS by an insured peril, through which rain, sleet, ice or snow enters.

The exterior of insured property is complete only when it has been constructed to a point that it is fully weather resistant and all of the final components of the exterior of the structure and its systems have been completely and permanently installed. The final components include but are not limited to:

Unofficial copy Travis Co. District Clerk Velva L. Price



      1. The roof and roof drainage systems;
      2. Exterior walls including siding;
      3. Windows;
      4. Doors;
      5. Vents and ventilation systems;
      6. Mechanical and electrical systems.

16.     FLOOD, but if LOSS by fire or explosion results, the Company will pay for that resulting LOSS. This exclusion does not apply to Property in Transit.

17.     EARTH MOVEMENT, but if LOSS by fire, explosion, or sprinkler leakage results, the Company will pay for that resulting LOSS. This exclusion does not apply to Property in Transit.

18.     Cost of Making Good:

     The costs that would have been incurred to rectify any of the following had such rectification been effected immediately prior to the LOSS:

     A. Fault, defect, error, deficiency or omission in design, plans, specifications, engineering or surveying;

     B. Faulty or defective workmanship, supplies or material;

     However, if direct physical LOSS by an insured peril ensues, then this Policy will provide cover for such ensuing LOSS only.

     For the purpose of this Policy and not merely this Excluded Cause of LOSS, insured property, or any portion thereof, shall not be regarded as damaged solely by virtue of the existence of any condition stated under A. or B. above.

**This Policy does not insure LOSS caused by any of the following, unless direct physical LOSS by an insured peril ensues and then this Policy insures only such ensuing direct physical LOSS:**

1.     Corrosion, decay, deterioration, erosion, evaporation, inherent vice, latent defect, leakage, loss of weight, rust, shrinkage, wear and tear, or any quality in property which causes it to damage or destroy itself.

2.     Normal settling, shrinking, cracking, expansion or contraction in foundations, walls, floors, buildings, patios, walkways, driveways, roads, or ceilings.

3.     Dryness or dampness of atmosphere.

4.     Extremes or changes in temperature.

APP 0549



**PART E**
**POLICY CONDITIONS**

These Policy Conditions apply to the entire Policy, including any endorsements attached to or made part of this Policy.  However, to the extent that these Policy Conditions are in conflict with any State Changes or State Amendatory endorsements attached to or made part of this Policy, the conditions of the State Changes or State Amendatory endorsements shall take precedence.

1.      Additional Insureds

        To the extent required by any written contract or subcontract for the INSURED PROJECT, and then only as their respective interests may appear, all owners, all contractors and subcontractors of every tier of the INSURED PROJECT, and any other individual or entity specified in such written contract or subcontract, are recognized as Additional Insureds hereunder.  As respects architects, engineers, manufacturers and suppliers, their interest is limited to their site activities only.

2.      LOSS Payable

        LOSS, if any, shall be adjusted with and made payable to the NAMED INSURED, or as per order of the NAMED INSURED, whose receipt shall constitute a release in full of all liability under this Policy with respect to such LOSS.

3.      Term of Insurance

        Coverage provided hereunder shall attach as of the date shown on the Declarations and shall continue in full force and effect until:

        A.   the expiration date shown on the Declarations,

        B.   final acceptance of the INSURED PROJECT by the owner,

        C.   abandonment of the INSURED PROJECT by the NAMED INSURED, or

        D.   the expiration of the NAMED INSURED's interest in the INSURED PROJECT;

        whichever first occurs.

        **Permission to Occupy**

        The owner may occupy the INSURED PROJECT for the purpose originally intended without the Company's written consent. The NAMED INSURED agrees that all planned fire protection and security systems will be installed, activated and operational prior to and during such occupancy.

4.      Premium

        A.   Deposit Premium: The premium stated on the Declarations is a deposit premium and shall be adjusted in accordance with Paragraph 4.C. Premium Adjustment.  The deposit premium shall be due and payable within thirty (30) days of the effective date shown or per the date noted on the invoice, whichever is earlier.

        B.   Reporting Provisions: Not later than thirty (30) days after the expiration, cancellation, or any requested extension of this Policy, the NAMED INSURED shall report to the Company the total completed value of all property including, but not limited to, all wages, expenses, materials, supplies, equipment and such other charges, all whether provided by the owner, contractor or others, which became a part of or was expended in the INSURED PROJECT.



C.  Premium Adjustment:

  1.  The final earned premium for this Policy shall be computed by applying the rates used for the purpose of computing the deposit premium to the actual term of coverage provided and the total completed value declared in accordance with Paragraph 4. B. Reporting Provisions.

  2.  If the premium so calculated shall differ from the deposit premium, such difference shall be due and payable to the NAMED INSURED or the Company, as the case may be

  3.  If the final completed values reported to the Company for the INSURED PROJECT vary by no more than 10% from the estimated completed values at inception then the Company and the NAMED INSURED agree that no Premium Adjustment will occur.  Any variation in completed values greater than 10% will require a Premium Adjustment under 1. and 2. above using the estimated completed value of the INSURED PROJECT at inception as the base.

D. Minimum Earned Premium:

  1.  If the NAMED INSURED cancels this Policy before the expiration date of the Policy, the Company will charge a minimum earned premium as stated on the Declarations.  If the Company cancels the Policy, no minimum earned premium applies.

  2.  If the NAMED INSURED cancels the Policy, the Company will calculate the return premium as determined by this Clause 4. Premium, the Policy Reporting Endorsement, if any, and amendatory endorsements, if any, attached to this Policy.  After the Company determines the return premium, the Company will subtract it from the Policy term premium to determine the earned premium.

  3.  The Company will then compare the earned premium to the minimum earned premium stated on the Declarations.  If the earned premium is less than the minimum earned premium, the Company will return to the NAMED INSURED the difference between the Policy term premium and the minimum earned premium.  If the earned premium is more than the minimum earned premium, the Company will return to the NAMED INSURED the difference between the Policy term premium and the earned premium as determined by this Clause 4. Premium, the Policy Reporting Endorsement, if any, and amendatory endorsements, if any, attached to this Policy.

5.  Deductibles

The Company will adjust all direct physical LOSS arising out of any one OCCURRENCE as one LOSS. The Company will not pay for direct physical LOSS in any one OCCURRENCE until the amount of the adjusted direct physical LOSS exceeds the applicable deductible stated on the Declarations. The Company will then pay the amount of the direct physical LOSS in excess of the applicable deductible.

Where a percentage deductible is shown on the Declarations, the deductible shall be the greater of the dollar amount shown, or the stated percentage of the total insured values at the INSURED PROJECT site or sites at the time and date of the LOSS, unless a maximum deductible is listed.

In the event that more than one deductible shown on the Declarations, or provided in any endorsement, shall apply to covered direct physical LOSS in any one OCCURRENCE, only the largest deductible shall be applied.

However, if this Policy is extended to provide coverage for Delay in Opening, the deductible stated on the applicable endorsement will be applied separately and in addition to the deductible(s) for the other coverages provided in this Policy.

Copyright 2013



6.      Valuation

At the time and place of direct physical LOSS, the basis of adjustment of a claim, unless otherwise endorsed herein, shall be as follows:

A.      Property Under Construction – The cost to repair or replace the insured property lost or damaged with material of like kind and quality, less betterment, including contractor's reasonable profit and overhead not exceeding the percentages in the original contract. If the insured property is not repaired or replaced then direct physical LOSS shall be settled on the basis of ACTUAL CASH VALUE.

B.      Property of Others (Including Items Supplied by the Owner) –  If Property of Others is new, the cost to repair or replace the insured property lost or damaged with material of like kind and quality, less betterment.  If Property of Others is not new then, the Owners cost or ACTUAL CASH VALUE, whichever is less.

If the Property of Others is not repaired or replaced then direct physical LOSS shall be settled on the basis of ACTUAL CASH VALUE.

C.      TEMPORARY STRUCTURES – The cost to repair or replace the insured property lost or damaged with material of like kind, quality and condition but in the event the insured property is not repaired or replaced recovery will not exceed the ACTUAL CASH VALUE.

D.      Valuable Papers and Records - The cost to reproduce the insured property with other property of like kind and quality including the cost of gathering or assembling information from back up data if replaced, or if not replaced, at the value of blank material.

E.      ELECTRONIC MEDIA or ELECTRONIC DATA - The cost of the blank media, plus the costs of copying or restoring ELECTRONIC DATA from back-up or from originals of a previous generation, not including research and engineering or the costs or expense of recreating, gathering or assembling such ELECTRONIC DATA.

This Policy does not insure any amount pertaining to the value of such ELECTRONIC DATA to the Named Insured or any other party, even if such ELECTRONIC DATA cannot be recreated, gathered or assembled.  If not repaired, replaced or restored, ELECTRONIC MEDIA shall be valued at the cost of the blank media.

F.      Trees, Shrubs and Plants - The cost to replace with property of like kind and quality plus the proper proportion of labor expended if such damage occurs after installation.

G.      Office and Construction Trailers/Semi-trailers and their Contents – ACTUAL CASH VALUE.

The Company will pay for direct physical LOSS to insured property by determining its REPLACEMENT COST, provided that the NAMED INSURED actually repairs or replaces the lost or damaged insured property, or begins to repair the damaged insured property, within 24 months from the date of direct physical LOSS; otherwise, the Company will pay for direct physical LOSS to insured property by determining its ACTUAL CASH VALUE.

7.      Cancellation

A.      This Policy may be cancelled by the NAMED INSURED by mailing to the Company written notice stating when, thereafter, such cancellation shall be effective.  The Company may cancel this Policy by mailing to the NAMED INSURED at the address shown in the Policy written notice stating when, not less than 60 days thereafter, such cancellation will be effective.  In the event of non-payment, the Company shall give 15 days notice.  The mailing of notice as aforementioned shall be sufficient proof of notice and the effective date of cancellation stated in the notice shall



become the end of the Policy period.  Delivery of such written notice either by the NAMED INSURED or by the Company shall be equivalent to mailing.

B.      If the NAMED INSURED or the Company cancels, earned premiums shall be computed in accordance with Part E.4.C. Premium Adjustment and Part E.4.D. Minimum Earned Premium.

C.      Premium adjustment may be made at the time cancellation is effected and, if not then made, shall be made as soon as practicable after cancellation becomes effective.  The Company's check or the check of its representative mailed or delivered as aforesaid shall be a sufficient tender of any refund of premium due to the NAMED INSURED.

8.      Inspection and Audit

While this Policy is in effect, the Company may, at any reasonable time, inspect the NAMED INSURED's property and operations.  However, any recommendations or information provided as a result of such inspection(s) is not intended as a substitute for advice from a safety expert or legal counsel the NAMED INSURED may retain for their intended purpose(s). It is not intended to satisfy any legal duty the NAMED INSURED may have to provide a safe premises, workplace, product or operation.

The Company may also examine and audit the NAMED INSURED's books and records at any reasonable time during the Policy period, and within one year after the final termination of the Policy, as long as they relate to the subject matter of this Policy.

9.      Assignment

The NAMED INSURED agrees not to assign and/or transfer any legal rights or interests in the Policy without the Company's written consent.

10.     Abandonment

There will be no abandonment of any insured property to the Company.

11.     Appraisal

If the NAMED INSURED and the Company fail to agree on the amount of the LOSS, each, upon written demand of either the NAMED INSURED or the Company made within sixty (60) days after receipt of proof of LOSS by the Company, shall select a competent and disinterested appraiser.  The appraisers shall then select a competent and disinterested umpire. If they should fail for fifteen (15) days to agree upon such umpire, then upon the request of the NAMED INSURED or the Company, such umpire shall be selected by a judge of a court of record in the jurisdiction in which such appraisal is pending.  Then, at a reasonable time and place, the appraisers shall appraise the LOSS based on the Valuation conditions within the Policy. If the appraisers agree, their written agreement shall determine the amount of LOSS and shall be paid by the Company within thirty (30) days thereafter.
If the appraisers fail to agree, they shall submit their differences to the umpire.  The umpire shall then submit a written award resolving such differences.  Such award shall determine the amount of the LOSS and shall be paid by the Company within thirty (30) days thereafter.
The NAMED INSURED and the Company shall each pay its chosen appraiser and shall bear equally the other expenses of the appraisal and umpire.  The Company shall not be held to have waived any of its rights by any act relating to appraisal.

12.     In Case of LOSS

A.      Notice of OCCURRENCE:

The NAMED INSURED will, as soon as practicable, report in writing to the Company every OCCURRENCE that may give rise to a claim under this Policy.



B.      Proof of LOSS:

The NAMED INSURED will as soon as practicable, file with the Company a signed and sworn detailed proof of LOSS.

C.      Payment of LOSS:

All adjusted claims, including partial payments thereon will be due and payable no later than thirty (30) days after presentation and acceptance of proof of LOSS or partial proof of LOSS, as the case may be, by this Company or its appointed representative.

13.     Other Insurance

Except as stated in the Contributing Insurance and Excess Insurance articles, if there is other insurance which is issued by another valid policy or policies of insurance, whether primary or excess, whether collectible or not, this Policy will apply as excess insurance and will not contribute with such other insurance, nor shall the Company be liable to make any payment in connection with any such portion of a claim or suit.

14.     Contributing Insurance

Permission is granted for other policies written upon the same plan, conditions, and provisions as those contained herein.

This Policy will contribute to the total of each LOSS otherwise payable herein to the extent of the participation of this Policy in the total Limit of Insurance, as provided by all policies written upon the same plan, conditions, and provisions as those contained in this Policy.

The adjustment of losses by any contributing insurance company is not binding on any other contributing insurance company.

15.     Excess Insurance

Permission is granted the NAMED INSURED to have excess insurance over the Limit of Insurance set forth in this Policy without prejudice to this Policy, nor will the existence of such insurance, if any, reduce any liability under this Policy.

16.     Pair and Set

A.      In the event of LOSS to any insured article or articles which are part of a pair or set, the measure of LOSS to such article or articles will be a reasonable and fair proportion of the total value of the pair or set, giving consideration to the importance of said article or articles, but in no event will such LOSS be construed to mean total LOSS of the pair or set, or

B.      In the event of LOSS to any part of insured property consisting, when complete for use, of several parts, the Company will only be liable for the value of the part lost or damaged.

17.     Recovery or Salvage

Any recovery or salvage will apply as if recovered or received prior to the LOSS settlement and the LOSS will be readjusted accordingly, except for:

A.      proceeds from subrogation and other insurance recovered or received after a LOSS settlement under this Policy;

B.      any recovery from suretyship, insurance, reinsurance, security or indemnity taken by or for the benefit of the Company.



18.     Reinstatement

With the exception of LOSS caused by insured perils which are subject to Annual Aggregate Sub-limits of Insurance, any LOSS hereunder will not reduce the limits available under this Policy.

19.     Subrogation

If the Company pays a claim under this Policy, it will be subrogated, to the extent of such payment, to all the NAMED INSURED's rights of recovery from other persons, organizations and entities.  The NAMED INSURED will execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

The Company will have no rights of subrogation against:

A.   any person or entity, which is an Additional Insured;

B.   any other person or entity, against which the NAMED INSURED has waived its rights of subrogation in writing before the time of LOSS.

Notwithstanding the foregoing, it is a condition of this Policy that the Company shall be subrogated to all the NAMED INSURED's rights of recovery against:

A.   Any Architect or Engineer, whether or not a NAMED INSURED or Additional Insured, for any LOSS arising out of the performance of professional services in their capacity as such and caused by any error, omission, deficiency or act of the Architect or Engineer, by any person employed by them or by any others for whose acts they are legally liable, and;

B.   Any manufacturer or supplier of machinery, equipment or other property, whether or not a NAMED INSURED or Additional Insured, of the cost of making good any LOSS  which said party has agreed to make good under a guarantee or warranty, whether expressed or implied.

The NAMED INSURED will act in concert with the Company and all other interests concerned in the exercise of such rights of recovery.

If any amount is recovered as a result of such proceedings, the net amount recovered after deducting the costs of recovery, will accrue first to the Company in proportion to their respective interests.  Any excess of this amount will be remitted to the NAMED INSURED.  If there is no recovery, the interests instituting the proceedings will bear the expense of the proceedings proportionately.

The NAMED INSURED will do nothing after LOSS to prejudice such rights of subrogation.

20.     Misrepresentation & Fraud

This Policy shall be void if the NAMED INSURED has concealed or misrepresented any material fact(s) or circumstance(s) concerning this insurance or the subject thereof, or in case of any fraud, attempted fraud or false swearing by the NAMED INSURED concerning any matter relating to this insurance or the subject thereof, whether before or after a LOSS.

21.     Legal Action Against the Company

No one may bring a legal action against the Company under this Policy unless:

A. There has been full compliance with all the conditions of this Policy; and

B. The action is brought within 2 years after the NAMED INSURED first has knowledge of the direct physical LOSS.



22.   Benefit to Bailee

The Policy will not inure, directly or indirectly, to the benefit or any carrier or bailee.

23.   CoverageTerritory

This Policy covers insured property within the United States of America, including the District of Columbia and Canada; except that this Policy will not cover Property in Transit by water or air to and from Alaska or to and from Hawaii.

24.   Certificates of Insurance

Any Certificate of Insurance issued in connection with this Policy shall be issued solely as a matter of convenience or information for the addressee(s) or holder(s) of said Certificate of Insurance. This Policy may only be modified by endorsement issued by the Company.

25.   Statutes

If any of the Articles herein stated conflict with the laws or statutes of any jurisdictions in which this Policy applies, the same is amended to conform to such laws or statutes.

26.   Observance of Conditions

Full compliance with all terms and conditions of this Policy by the NAMED INSURED shall be a condition precedent to any liability of the Company to make payment for LOSS under this Policy.

27.   Increased Hazard

If there is an increased hazard in the risk, change in project scope or change in project principals, the NAMED INSURED shall give notice in writing to the Company within 30 days of the increase in hazard or change.  The Company shall have the right, but not the obligation, to modify the terms of insurance in accordance with the terms and conditions that would apply to the increased hazard.

28.   Examination Under Oath

The NAMED INSURED shall submit and, so far as is within their power, shall cause all other persons to submit, to examination or examinations under oath by any persons named by the Company relative to any and all matters in connection with a claim, and shall produce for examination all books of accounts, bills, invoices, and other vouchers or certified copies thereof if originals are lost, at such reasonable time and place as may be designated by the Company or its representatives as often as the Company deems necessary, and shall permit extracts and copies thereof to be made.

29.   Brands & Trademarks

In any case of LOSS by an insured peril to insured property bearing a brand, trademark or label, the Company may take all or any part of the insured property at any agreed or appraised value.  If so, the NAMED INSURED may, at its own expense:

A.   Stamp salvage on the insured property or its container, if the stamp will not physically damage the insured property; or

B.   Remove the brand, trademark or label if doing so will not physically damage the insured property. The NAMED INSURED must re-label the insured property or its container to comply with the law.



30. Protection of Insured Property:

The NAMED INSURED will take reasonable steps to protect, recover or save the insured property and minimize any further or potential LOSS when the insured property has sustained direct physical LOSS by an insured peril. The acts of the NAMED INSURED or the Company in protecting, recovering or saving the insured property will not be considered a waiver or an acceptance of abandonment. The NAMED INSURED and the Company will bear the reasonable expense incurred proportionate to their respective interests under this Policy.

31. Mortgage Holders

The entities listed on the Declarations and designated as a Mortgage Holder are added to this Policy for the INSURED PROJECT covered by this Policy, subject to the following terms and conditions:

The term "mortgage holder" includes a trustee.

A. The Company will pay for LOSS, if any, to each mortgage holder shown in the mortgage holder schedule in their order of precedence, as interests may appear.

B. The mortgage holder has the right to receive LOSS payment even if the mortgage holder has started foreclosure or similar action on the INSURED PROJECT.

C. If the Company denies a claim due to the acts of the NAMED INSURED or because the NAMED INSURED has failed to comply with the terms of this Policy, the mortgage holder will still have the right to receive LOSS payment if the mortgage holder:

1. Pays any premium due under this Policy at the request of the Company if the NAMED INSURED has failed to do so.

2. Submits a signed, sworn proof of LOSS within 60 days after receiving notice from the Company of the NAMED INSURED'S failure to do so; and

3. Has notified the Company of any change in ownership, occupancy, or substantial change in risk known to the mortgage holder.

All terms of this Policy will then apply directly to the mortgage holder.

D. If the COMPANY pays the mortgage holder for any LOSS and denies payment to the NAMED INSURED because of their acts or because they have failed to comply with the terms of this Policy:

1. The mortgage holder's rights under the mortgage will be transferred to the Company to the extent of the amount paid; and

2. The mortgage holder's right to recover the full amount of the mortgage holder's claim will not be impaired.

At the option of the Company, the Company may pay to the mortgage holder the whole principal on the mortgage plus any accrued interest. In this event, the mortgage and note will be transferred to the Company and the NAMED INSURED will pay the remaining mortgage debt to the Company.

E. If the Company cancels this Policy, the Company will endeavor to give written notice to the mortgage holder at least:

1. 15 days before the effective date of cancellation, if cancelled for non-payment of premium; or

2. 45 days before the effective date of cancellation, if cancelled for any other reason.

The Company's failure to provide notice of cancellation to the mortgage holder will not invalidate the cancellation.

F. If the Company does not renew the Policy, the Company will endeavor to give written notice to the mortgage holder at least 45 days before the expiration date of this Policy. The Company's failure to provide notice to the mortgage holder will not invalidate the non-renewal.



32.    Loss Payees

The entities listed on the Declarations and designated as Loss Payee are added to this Policy for the INSURED PROJECT covered by this Policy, subject to the following terms and conditions:

The Company will adjust a LOSS with the NAMED INSURED and the Loss Payee(s) shown on the Declarations and the Company will pay the NAMED INSURED, and the Loss Payee(s), up to their interest in insured property, the amount the Company owes, if anything.

33.    Unpacked Property

The NAMED INSURED shall inspect all items that are included in the values to be insured for the INSURED PROJECT covered by this Policy upon arrival at the INSURED PROJECT site.

In the case of unpacked property where LOSS is evident, such LOSS is excluded under this Policy, except to the extent it is indemnified under the terms provided by the Property in Transit Extension of Coverage.

In the case of packed property (which is intended to remain in its packing until a later date after arrival at the INSURED PROJECT site), the packing is to be inspected and in the event of any visible signs of LOSS, the property contained therein is to be promptly unpacked and inspected.  Any LOSS to such property which is thus discovered is excluded under this Policy, except to the extent it is indemnified under the terms of the Property in Transit Extension of Coverage.

In the event the packing of the property manifests no sign of LOSS and the property is therefore temporarily left packed, any LOSS which is discovered when the property is unpacked will be deemed to have occurred during transit unless there is clear evidence from the nature of the LOSS that it could only have occurred after arrival at the INSURED PROJECT site.

**PART F
DEFINITIONS**

The following definitions will be applied in the interpretation of certain wording used herein

1.    ACTUAL CASH VALUE

The replacement cost at the time of LOSS, of the insured property damaged or destroyed, less depreciation.

2.    COMPUTER VIRUS

Instructions, code, applications or any software program that has the ability or is suspected to have the ability to damage, destroy, erase, corrupt, alter, or prevent access to ELECTRONIC DATA, ELECTRONIC MEDIA or COMPUTERS or to disrupt or interfere with the operations of COMPUTERS.

3.    COMPUTERS

Includes but is not limited to mainframes, servers, workstations and portable computers, personal information managers, wide and local area network hardware, electronic and electromechanical equipment, data processing equipment, electronic controls for machinery, electronically programmed memory chips, and electronically controlled communication equipment.



4.      CONTAMINANTS OR POLLUTANTS

Any material which, after its release, can cause or threaten damage to human health or human welfare or which can cause or threaten damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, any solid, liquid, gaseous or thermal irritant or contaminant including vapor, fumes, acids, soot, alkalis, virus, chemicals and waste or any hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, or as designated by the US Environmental Protection Agency.

5.      EARTH MOVEMENT

All earthquake, landslide, mudslide, mudflow, rock fall, tsunami, tectonic or seismic sea waves, volcanic eruption, earth sinking (other than sinkhole collapse), rising, shifting, subsidence or other EARTH MOVEMENT, whether observable or not observable, and whether man-made or caused by natural phenomena.

6.      ELECTRONIC DATA

Facts, concepts, information or data, including compilations thereof, in a form useable or intended for use or processing by COMPUTERS or for storage on ELECTRONIC MEDIA.  ELECTRONIC DATA includes but is not limited to files, programs, applications, operating systems, and other coded instructions for the processing, calculation and storage of facts, concepts and information by COMPUTERS.

7.      ELECTRONIC MEDIA

Any physical device that holds, stores, contains or transfers ELECTRONIC DATA, and includes but is not limited to disks, drives, films, tapes, records, drums, or cells.

8.      EXISTING PROPERTY

Property at the site of the INSURED PROJECT for which the values are not included in the INSURED PROJECT.  This includes EXISTING PROPERTY that is scheduled to be repaired, replaced, or modified as part of the INSURED PROJECT but which has not yet been fully repaired, replaced or modified.

9.      FLOOD

A general and temporary condition during which the surface of normally dry land is partially or completely inundated, which arises from:

A.   Rain and resultant runoff; or

B.   The rising, overflow or breach of any boundary of a natural or man-made body of water; or

C.   Non-tectonic or seismic sea waves, tide or tidal waters, storm surge, or spray from any of these; whether driven by wind or not; or

D.   The failure of a cofferdam or similar structure intended to hold water back from an area of construction; or

E.   Unexpected accumulation of water caused by subsurface seepage or subsurface leakage.

FLOOD does not include the accumulation of water from any source on a roof or other surface of a building, dwelling or structure.



10.    FUNGUS

Any type or form of FUNGUS, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

11.    HOT TESTING

Any start-up, commissioning or other forms of testing, including the checking of any plant or machinery or a component part thereof under load or operational conditions, including the use of feedstock or other materials for processing, or other media to simulate working conditions.

HOT TESTING does not include any start-up, commissioning or other forms of testing of building or civil construction systems, such as electric, heating, ventilation, air conditioning, sprinklers, water piping, plumbing, gas lines, air conditioning lines, elevators, escalators, electronic tolling, life safety or lighting.

12.    HOT TESTING PERIOD

That period beginning with the introduction into the insured property of feedstock or similar media for processing and handling, or the first firing of fuel(s), whichever first occurs. The HOT TESTING PERIOD shall continue thereafter whether or not such testing, commissioning or startup is continuous or intermittent and terminate on the expiration of this Policy.

13.    INSURED PROJECT

The work which the NAMED INSURED is contractually obligated to perform in accordance with the contract documents, being more fully described and located as set forth on the Declarations.

14.    LOSS

Accidental loss or damage.

15.    NAMED INSURED

The persons or companies identified on the Declarations of this Policy.

16.    NAMED WINDSTORM

An intense tropical weather system with a well-defined circulation and maximum sustained winds of at least 34 kt (39 mph or 63 km/hr) that is named by the National Oceanic and Atmospheric Administration (NOAA), including any of NOAA's organizations, such as the National Weather Service or the National Hurricane Center.

17.    OCCURRENCE

All LOSS attributable directly or indirectly to one cause, event, incident or repeated exposure to the same cause, event or incident, or to one series of similar causes, events, incidents or repeated exposures to the same cause, event or incident first occurring in the Policy period. All such LOSS will be treated as one occurrence irrespective of the period of time or area over which such LOSS occurs, unless a specific period of time is included in this Policy. The most the Company will pay for LOSS in any one occurrence is the applicable Limit of Insurance shown on the Declarations.

As respects the peril of EARTH MOVEMENT, OCCURRENCE shall mean all LOSS arising during a continuous period of seventy-two (72) hours during the term of this Policy.  The NAMED INSURED may elect the moment when the seventy-two (72) hour period begins, but no two such periods shall overlap. Such EARTH MOVEMENT shall be deemed to be a single OCCURRENCE within the meaning of this Policy.



As respects the peril of NAMED WINDSTORM, OCCURRENCE shall mean all LOSS arising during a continuous period of seventy-two (72) hours during the term of this Policy. The NAMED INSURED may elect the moment when the seventy-two (72) hour period beings, but no two periods shall overlap. Such NAMED WINDSTORM shall be deemed to be a single OCCURRENCE within the meaning of this Policy.

As respects the peril of FLOOD, OCCURRENCE shall mean all LOSS arising during a continuous condition as defined in the definition of FLOOD.

The Company shall not be liable for any such LOSS occurring before the effective date and time or occurring after the expiration date and time of this Policy.

18.     REPLACEMENT COST

The cost to repair or replace the insured property lost or damaged at the time and place of direct physical LOSS with material of like kind and quality, less betterment.

19.     TEMPORARY STRUCTURES

Cribbing, scaffolding, shoring, fences, construction forms and other similar structures on the INSURED PROJECT site, but TEMPORARY STRUCTURES does not include construction tools, equipment or storage structures.

20.     TRANSMISSION AND DISTRIBUTION LINES

Overhead transmission and distribution lines, poles, towers and all equipment attached or affixed thereto, including supporting structures.

21.     WATER DAMAGE

All water damage, except LOSS caused by or resulting from the peril of FLOOD.

Unofficial copy Travis Co. District Clerk Velva L. Price

# NUCLEAR, BIOLOGICAL, CHEMICAL, RADIOLOGICAL EXCLUSION ENDORSEMENT

| Named Insured<br>Manchester Austin, LLC | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>IMC | Policy Number<br>I08909726 001 | Policy Period<br>11/05/2014 **to**  08/05/2017 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

**THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.**

**This endorsement modifies insurance provided under the following:**

**BOILER AND MACHINERY COVERAGE PART**
**COMMERCIAL INLAND MARINE COVERAGE PART**
**COMMERCIAL PROPERTY COVERAGE PART**
**CRIME AND FIDELITY COVERAGE PART**

The following exclusions are added to your Policy or Coverage Part.

This insurance does not apply to:

**A.** Loss or damage arising directly or indirectly from nuclear detonation, reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by, any physical loss or damage insured against by this Policy or Coverage Part, however such nuclear detonation, reaction, nuclear radiation or radioactive contamination may have been caused. This exclusion replaces any other nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination exclusion found elsewhere in this Policy.

**B.** Loss or damage arising directly or indirectly from the dispersal, application or release of, or exposure to, chemical, radiological, or biological materials or agents, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by, any physical loss or damage insured against by this Policy or Coverage Part, however such dispersal, application, release or exposure may have been caused.

**C.** If this endorsement is attached to a Commercial Inland Marine Policy or Coverage Part, the term loss or damage is changed to Loss.

## DELAY IN OPENING ENDORSEMENT

| Named Insured<br>**Manchester Austin, LLC** | | | Endorsement Number | |
|---|---|---|---|---|
| Policy Symbol<br>**IMC** | Policy Number<br>**I08909726 001** | Policy Period<br>**11/05/2014 to  08/05/2017** | Effective Date of Endorsement | |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | | |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### CONSTRUCTION RISK COVERAGE FORM

For the purpose of this endorsement only, the NAMED INSURED if different from that stated on the Policy Declarations, shall be as shown below. There shall be no Additional Insureds hereunder, unless specifically endorsed below.

Whenever "NCP" is shown below it denotes no coverage has been purchased and no coverage is provided.  Whenever "NA" is shown below it denotes "Not Applicable" to that coverage, deductible, Sub-limit of Insurance, or other policy provision.

NAMED INSURED:   **Manchester Austin, LLC**

PERIOD OF INDEMNITY:                                   **365**   Calendar Days

SCHEDULED DATE OF COMPLETION:          **08/05/2017**

WAITING PERIOD:                                **21**   Calendar Days, Each DELAY except;

|  |  |  |
|---|---|---|
| A.  Each DELAY caused by or resulting from FLOOD: | **21** | Calendar Days |
| B.  Each DELAY caused by or resulting from EARTH MOVEMENT: | **21** | Calendar Days |
| C.  Each DELAY caused by or resulting from NAMED WINDSTORM: | **21** | Calendar Days |

In return for the payment of premium and subject to all the terms and conditions of this Policy and individual Sub-limits of Insurance shown below, the total Sub-limit of Insurance for which the Company shall be liable under this endorsement per OCCURRENCE and in the Aggregate shall not exceed  $ _. These Sub-limits of Insurance are part of and not in addition to the Limit of Insurance Per OCCURRENCE stated on the Policy Declarations.

| | | | | |
|---|---|---|---|---|
| 1.  Loss Of RENTAL INCOME | $ | **Not Covered** | Monthly Limit of Indemnity | $  Not Applicable |
| 2.  Loss Of GROSS EARNINGS | $ | **Not Covered** | Monthly Limit of Indemnity | $  Not Applicable |
| 3.  SOFT COSTS /  ADDITIONAL EXPENSES<br>Refer to Individual Item Sub-limits below: | $ | **57,923,783** | Monthly Limit of Indemnity | $  Not Applicable |
| Interest expense on construction loan(s); | $ | **Not Covered** | Monthly Limit of Indemnity | $  Not Applicable |
| Advertising and promotional expense; | $ | **5,500,000** | Monthly Limit of Indemnity | $  Not Applicable |
| Legal and accounting fees; | $ | **1,350,000** | Monthly Limit of Indemnity | $  Not Applicable |
| Commission is incurred upon the Renegotiation of leases; | $ | **Not Covered** | Monthly Limit of Indemnity | $  Not Applicable |
| Fees for licenses and permits; | $ | **4,200,000** | Monthly Limit of Indemnity | $  Not Applicable |
| Insurance premiums for Builders Risk, Workers' Compensation and General Liability Insurance; | $ | **900,000** | Monthly Limit of Indemnity | $  Not Applicable |
| Real Estate taxes and assessments; | $ | **3,400,000** | Monthly Limit of Indemnity | $  Not Applicable |
| Project administration expense; | $ | **Not Covered** | Monthly Limit of Indemnity | $  Not Applicable |
| Financing Costs ; | $ | **18,073,783** | Monthly Limit of Indemnity | $  Not Applicable |

ACE0729 (10/13)                              Copyright 2013                              Page 1 of 5

Unofficial copy from Travis Co. District Clerk Velva L. Price

| | | | | |
|---|---|---|---|---|
| Design Consultants ; | $ | **14,000,000** | Monthly Limit of Indemnity | $  Not Applicable |
| Developer Overhead & Fees ; | $ | **10,000,000** | Monthly Limit of Indemnity | $  Not Applicable |
| Technical Servicing Fee | $ | **500,000** | Monthly Limit of Indemnity | $  Not Applicable |

## INSURING AGREEMENT

1.  Subject to all terms, conditions, limitations and exclusions of this Endorsement, and of the Policy to which it is attached, the Company will pay the actual Loss of RENTAL INCOME, Loss of GROSS EARNINGS and/or SOFT COSTS/ADDITIONAL EXPENSES sustained during the PERIOD OF INDEMNITY as a result of a DELAY in completion of the INSURED PROJECT described on the Policy Declarations, or as amended by Endorsement, when such DELAY is caused by an OCCURRENCE or series of OCCURRENCE(S), resulting in physical LOSS to insured property by an insured peril.

2.  The Company shall also indemnify the NAMED INSURED for expenditures during the PERIOD OF INDEMNITY that are necessarily incurred for the purpose of reducing any loss amount under this endorsement, but only to the extent that such loss amount otherwise payable under this endorsement is thereby reduced.

3.  The Company will pay the actual Loss of RENTAL INCOME, Loss of GROSS EARNINGS and/or SOFT COSTS/ADDITIONAL EXPENSES sustained as a result of a DELAY in completion of the INSURED PROJECT, caused by action of civil authority that prohibits access to the INSURED PROJECT site stated on the Policy Declarations due to direct physical LOSS to property, other than at the INSURED PROJECT site stated on the Policy Declarations, caused by or resulting from an insured peril. This coverage will apply for a period of up to thirty (30) consecutive days after the application of the DELAY IN OPENING WAITING PERIOD.

4.  The Company will pay the actual Loss of RENTAL INCOME, Loss of GROSS EARNINGS and/or SOFT COSTS/ADDITIONAL EXPENSES sustained as a result of a DELAY in completion of the INSURED PROJECT, caused by an insured peril that prohibits access to the INSURED PROJECT site stated on the Policy Declarations due to direct physical LOSS to property, other than at the INSURED PROJECT site stated on the Policy Declarations. This coverage will apply for a period of up to thirty (30) consecutive days after the application of the DELAY IN OPENING WAITING PERIOD.

5.  The Company will pay for the actual Loss of RENTAL INCOME, Loss of GROSS EARNINGS and/or SOFT COSTS/ADDITIONAL EXPENSES sustained as a result of a DELAY in completion of the INSURED PROJECT caused by loss of electrical, steam, gas, water, sewer, telephone, or any other utility or service, situated on or within two (2) statute miles to the INSURED PROJECT due to direct physical LOSS caused by an insured peril.  This coverage will apply for a period of up to thirty (30) consecutive days after the application of the DELAY IN OPENING WAITING PERIOD.

## WAITING PERIOD

1.  The coverage provided by this endorsement applies to each DELAY that exceeds the WAITING PERIOD, and only for such part of that DELAY that is in excess of this period.

2.  In the event that more than one WAITING PERIOD shall apply to the coverage provided by this endorsement, only the longest WAITING PERIOD shall be applied.

3.  The WAITING PERIOD of this endorsement applies independently and shall not be combined with any deductible that applies to physical LOSS covered by this Policy.

## ADDITIONAL EXCLUSIONS

The Company shall not be liable for any increase in DELAY caused by or resulting from:

1.  The enforcement of any ordinance or law regulating construction, rebuilding, repair, replacement, removal or reconstruction of the work unless otherwise endorsed hereto.

2.  LOSS to property not insured by this policy.

3.  Alterations, additions, improvements or other changes made in the design, plans, specifications or other contract documents for the INSURED PROJECT which are required to effect the repair or replacement of the damaged property.

4.  The unavailability of funds for the repair or replacement of lost or damaged property.

5.  Import, export or customs restrictions and/or regulations.

6.  Breach of contract, late or non-completion of orders and/or suspension, lapse or cancellation of any lease or purchase order.

7.  Failure of the NAMED INSURED or any Additional Insureds to obtain, maintain or extend any permit, lease, license or purchase order commitments.

8.  Failure of the NAMED INSURED or any Additional Insureds to use due diligence and dispatch in restoring the damaged property to the condition existing prior to the LOSS.

9.  Interference with the INSURED PROJECT by strikers or other persons with the transportation of property, the construction, rebuilding, repairing or replacing of insured property hereunder or the occupancy and use of the premises.

10. Consequential damages including liquidated damages, performance or non-performance penalties, penalties for non-completion or non-compliance with contract conditions.

11. Any deviation from the original SCHEDULED DATE OF COMPLETION or revisions thereto, and which is independent of an insured LOSS which gives rise to a DELAY, whether occurring prior to or after an OCCURRENCE.

## GENERAL CONDITIONS

1.  The NAMED INSURED shall furnish in writing, as often as required by the Company, progress reports on the INSURED PROJECT, except the NAMED INSURED shall immediately advise the Company in writing of any change which is likely to affect the SCHEDULED DATE OF COMPLETION.  In the event a difference between the anticipated and actual progress of the work necessitates revision of the SCHEDULED DATE OF COMPLETION, the Company and the NAMED INSURED shall agree to a revised SCHEDULED DATE OF COMPLETION which will be endorsed to this Policy. The NAMED INSURED shall then establish a revised progress schedule for the work which will be the basis of comparison with future progress reports.  In the event of any further differences between the revised progress schedule and progress reports, similar revision(s) in the progress schedule will be made and a revised SCHEDULED DATE OF COMPLETION will be endorsed to this Policy.

    Revisions to the SCHEDULED DATE OF COMPLETION will not be made as a result of insured LOSS(es).

    In no case will the revised SCHEDULED DATE OF COMPLETION be earlier than the original SCHEDULED DATE OF COMPLETION shown hereon.

2.  It is a condition precedent to coverage under this endorsement that the NAMED INSURED shall make every reasonable attempt to minimize the amount of any LOSS by:

    A.  Making complete or partial use of covered or other property at the location of the INSURED PROJECT or other location; and/or

    B.  Make use of other machinery, equipment or supplies; and/or

    C.  Minimize the extent of any interference with the construction schedule so as to avoid or diminish any DELAY.

3.  The Company shall not be liable during the PERIOD OF INDEMNITY for more than the amount stated on Page 1 of this Endorsement.

4.  At the end of the first month of the PERIOD OF INDEMNITY and monthly thereafter, if it is possible for the Company to determine the minimum amount of loss payable under this endorsement for the elapsed period, the Company shall pay such amount(s) to the NAMED INSURED as an installment of the total loss.

5.  The Company shall have the right, but not the duty to conduct an audit of the NAMED INSURED's records twelve months after actual commencement of operations to determine the loss as defined by this Endorsement, as well as any expenses related to reducing loss incurred by the NAMED INSURED. Due consideration shall be given to

seasonal patterns, trends, variations or special circumstances which would have affected the business had the DELAY not occurred, so that the amount thus adjusted shall represent as nearly as may be reasonably practicable the amount which, in the absence of the DELAY, would have been realized. Any amount saved in respect of labor costs, charges and expenses that have ceased or reduced during the PERIOD OF INDEMNITY and liquidated damage the NAMED INSURED is entitled to receive, whether collectible or not, shall be deducted from the loss during the PERIOD OF INDEMNITY.

6.  If the amount of loss determined by any audit conducted by the Company is less than or exceeds the sum paid by the Company during the PERIOD OF INDEMNITY, the difference between the two amounts shall be paid by or to the Company as the case may be.

7.  Upon request by the Company, the NAMED INSURED shall make available all records and information relevant to the coverage provided by this endorsement.

8.  It is a condition of this insurance that the NAMED INSURED shall begin normal operations as soon as practical.

## DEFINITIONS

For purposes of this endorsement, the following definitions shall apply in addition to those set forth in the Policy:

1.  SCHEDULED DATE OF COMPLETION

    The later of the completion date scheduled in the construction contract and stated on Page 1 of this Endorsement, or the date the INSURED PROJECT would have been completed for commencement of commercial operations or use and occupancy if a LOSS had not occurred.

2.  WAITING PERIOD

    The number of calendar days per OCCURRENCE stated on Page 1 of this Endorsement, beginning with the later of the SCHEDULED DATE OF COMPLETION or the date the INSURED PROJECT could have been completed had there been no LOSS.

3.  DELAY

    The period of time between the SCHEDULED DATE OF COMPLETION and the actual date on which commercial operations or use and occupancy can commence with the exercise of due diligence and dispatch.

4.  GROSS EARNINGS

    The amount not realized by the NAMED INSURED during the PERIOD OF INDEMNITY which would have been earned from the commencement of operations or use and occupancy of the work if the DELAY had not occurred, consisting of;

    The sum of:

    A.  Total net sales value of production;

    B.  Total net sales of merchandise;

    C.  Other earnings derived from operations of the business

    Less the cost of:

    D.  Raw stock from which such production is derived;

    E.  Supplies consisting of materials consumed directly in the conversions of such raw stock into finished stock or in supplying the service(s) sold by the NAMED INSURED;

    F.  Merchandise sold, including packaging materials thereof; and

    G.  Service(s) purchased from outsiders (not employees of the NAMED INSURED) for resale which do not continue under contract.

    No other cost shall be deducted in determining GROSS EARNINGS.

5.   PERIOD OF INDEMNITY

The number of days stated on Page 1 of this Endorsement which are in excess of the WAITING PERIOD. The PERIOD OF INDEMNITY for any insured DELAY hereunder shall not be limited or otherwise affected by the expiration, cancellation or termination of the Policy.

6.   RENTAL INCOME

Revenues from rentals and leases not realized during the PERIOD OF INDEMNITY, which would have been earned by the NAMED INSURED if the DELAY had not occurred, less non-continuing expenses.

7.   SOFT COSTS/ADDITIONAL EXPENSES

Expenditures which are necessarily incurred during the PERIOD OF INDEMNITY, which would not have been incurred by the NAMED INSURED if the DELAY had not occurred, including:

A.   Interest expense on construction loan(s);

B.   Advertising and promotional expense;

C.   Legal and accounting fees;

D.   Commissions incurred upon renegotiation of leases;

E.   Fees for licensing and permits;

F.   Insurance premiums for Builders Risk, Workers' Compensation and General Liability Insurance;

G.   Real estate taxes and assessments;

H.   Project administration expense;

I.   Other, as accepted by the Company and scheduled on this Endorsement.

All other terms and conditions remain unchanged.

## RAIN, SLEET, ICE OR SNOW COVERAGE ENDORSEMENT

| Named Insured<br>Manchester Austin, LLC | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>IMC | Policy Number<br>I08909726 001 | Policy Period<br>11/05/2014 **to**   08/05/2017 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**CONSTRUCTION RISK COVERAGE FORM**

**PART D EXCLUSIONS,** Excluded Causes of LOSS, Item 15 is deleted in its entirety.

The following is added under **PART C EXTENSIONS OF COVERAGE**:

The Company will pay for LOSS to insured property caused by or resulting from rain, sleet, ice or snow, whether driven by wind or not, entering the interior of an INSURED PROJECT, whether or not the exterior of the INSURED PROJECT is complete.

The most the Company will pay for LOSS in any one OCCURRENCE for this EXTENSION OF COVERAGE is $ **356,027,843**

The Sub-limit of Insurance shown above is part of and not in addition to the Limit of Insurance Per OCCURRENCE stated on the Declarations.

The deductible amount for the coverage provided by this EXTENSION OF COVERAGE is $ **50,000**

All other terms and conditions remain unchanged.

Unofficial copy Travis Co. District Clerk Velval. Price

## TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

| Named Insured<br>Manchester Austin, LLC | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>IMC | Policy Number<br>I08909726 001 | Policy Period<br>11/05/2014 **to**  08/05/2017 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, but not limited to, the payment of claims.  All other terms and conditions of policy remain unchanged.

_____

Authorized Agent

ALL-21101 (11-06) Ptd. In U.S.A.

IL 01 04 09 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART – FARM PROPERTY – OTHER FARM PROVISIONS FORM – ADDITIONAL
COVERAGES, CONDITIONS, DEFINITIONS
FARM COVERAGE PART – LIVESTOCK COVERAGE FORM
FARM COVERAGE PART – MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM
STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99** the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** The **Concealment, Misrepresentation Or Fraud** Condition is replaced by the following with respect to loss ("loss") or damage caused by fire:

We do not provide coverage to the insured ("insured") who, whether before or after a loss ("loss"), has committed fraud or intentionally concealed or misrepresented any material fact or circumstance concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** That insured's ("insured's") interest in the Covered Property; or

**4.** A claim under this Coverage Part or Coverage Form.

**C.** The **Concealment, Misrepresentation Or Fraud** Condition is replaced by the following with respect to loss ("loss") or damage caused by a Covered Cause of Loss other than fire:

This Coverage Part is void if any insured ("insured"), whether before or after a loss ("loss"), has committed fraud or intentionally concealed or misrepresented any material fact or circumstance concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Any insured's ("insured's") interest in the Covered Property; or

**4.** A claim under this Coverage Part or Coverage Form.

**D.** Except as provided in **E.,** the **Appraisal** Condition is replaced by the following:

If we and you disagree on the value of the property or the amount of loss ("loss"), either may make written request for an appraisal of the loss ("loss"). If the request is accepted, each party will select a competent and impartial appraiser. Each party shall notify the other of the appraiser selected within 20 days of the request. The two appraisers will select an umpire. If they cannot agree within 15 days, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss ("loss"). If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**1.** Pay its chosen appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**E.** The Appraisal Condition in:

**1.** Business Income (And Extra Expense) Coverage Form **CP 00 30;** and

**2.** Business Income (Without Extra Expense) Coverage Form **CP 00 32;**

© ISO Properties, Inc., 2006

APP 0570

is replaced by the following:

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written request for an appraisal of the loss. If the request is accepted, each party will select a competent and impartial appraiser. Each party shall notify the other of the appraiser selected within 20 days of the request. The two appraisers will select an umpire. If they cannot agree within 15 days, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

IL 02 70 09 12

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraphs **2.** and **3.** of the **Cancellation** Common Policy Condition are replaced by the following:

**2. All Policies In Effect For 60 Days Or Less**

If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

**a.** 10 days before the effective date of cancellation if we cancel for:

**(1)** Nonpayment of premium; or

**(2)** Discovery of fraud by:

**(a)** Any insured or his or her representative in obtaining this insurance; or

**(b)** You or your representative in pursuing a claim under this policy.

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3. All Policies In Effect For More Than 60 Days**

**a.** If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

**(1)** Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

**(2)** Discovery of fraud or material misrepresentation by:

**(a)** Any insured or his or her representative in obtaining this insurance; or

**(b)** You or your representative in pursuing a claim under this policy.

**(3)** A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

IL 02 70 09 12                     © Insurance Services Office, Inc., 2012                     **Page 1 of 4**

APP 0572

**(4)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

**(5)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(6)** A determination by the Commissioner of Insurance that the:

**(a)** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

**(b)** Continuation of the policy coverage would:

**(i)** Place us in violation of California law or the laws of the state where we are domiciled; or

**(ii)** Threaten our solvency.

**(7)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

**b.** We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured at the mailing address shown in the policy, and to the producer of record, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph **3.a.**

**B.** The following provision is added to the **Cancellation** Common Policy Condition:

**7. Residential Property**

This provision applies to coverage on real property which is used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household personal property in a residential unit, if such coverage is written under one of the following.

Commercial Property Coverage Part

Farm Coverage Part – Farm Property – Farm Dwellings, Appurtenant Structures And Household Personal Property Coverage Form

**a.** If such coverage has been in effect for 60 days or less, and is not a renewal of coverage we previously issued, we may cancel this coverage for any reason, except as provided in **b.** and **c.** below.

**b.** We may not cancel this policy solely because the first Named Insured has:

**(1)** Accepted an offer of earthquake coverage; or

**(2)** Cancelled or did not renew a policy issued by the California Earthquake Authority (CEA) that included an earthquake policy premium surcharge.

However, we shall cancel this policy if the first Named Insured has accepted a new or renewal policy issued by the CEA that includes an earthquake policy premium surcharge but fails to pay the earthquake policy premium surcharge authorized by the CEA.

**c.** We may not cancel such coverage solely because corrosive soil conditions exist on the premises. This restriction **(c.)** applies only if coverage is subject to one of the following, which exclude loss or damage caused by or resulting from corrosive soil conditions:

**(1)** Commercial Property Coverage Part – Causes Of Loss – Special Form; or

**(2)** Farm Coverage Part – Causes Of Loss Form – Farm Property, Paragraph **D.** Covered Causes Of Loss – Special.

© Insurance Services Office, Inc., 2012   IL 02 70 09 12

APP 0573

**C.** The following is added and supersedes any provisions to the contrary:

**Nonrenewal**

1. Subject to the provisions of Paragraphs **C.2.** and **C.3.** below, if we elect not to renew this policy, we will mail or deliver written notice, stating the reason for nonrenewal, to the first Named Insured shown in the Declarations, and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

   We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

2. **Residential Property**

   This provision applies to coverage on real property used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household property contained in a residential unit, if such coverage is written under one of the following:

   Commercial Property Coverage Part

   Farm Coverage Part – Farm Property – Farm Dwellings, Appurtenant Structures And Household Personal Property Coverage Form

   **a.** We may elect not to renew such coverage for any reason, except as provided in **b.**, **c.** and **d.** below.

   **b.** We will not refuse to renew such coverage solely because the first Named Insured has accepted an offer of earthquake coverage.

      However, the following applies only to insurers who are associate participating insurers as established by Cal. Ins. Code Section 10089.16. We may elect not to renew such coverage after the first Named Insured has accepted an offer of earthquake coverage, if one or more of the following reasons applies:

      **(1)** The nonrenewal is based on sound underwriting principles that relate to the coverages provided by this policy and that are consistent with the approved rating plan and related documents filed with the Department of Insurance as required by existing law;

      **(2)** The Commissioner of Insurance finds that the exposure to potential losses will threaten our solvency or place us in a hazardous condition. A hazardous condition includes, but is not limited to, a condition in which we make claims payments for losses resulting from an earthquake that occurred within the preceding two years and that required a reduction in policyholder surplus of at least 25% for payment of those claims; or

      **(3)** We have:

         **(a)** Lost or experienced a substantial reduction in the availability or scope of reinsurance coverage; or

         **(b)** Experienced a substantial increase in the premium charged for reinsurance coverage of our residential property insurance policies; and

         The Commissioner has approved a plan for the nonrenewals that is fair and equitable, and that is responsive to the changes in our reinsurance position.

   **c.** We will not refuse to renew such coverage solely because the first Named Insured has cancelled or did not renew a policy, issued by the California Earthquake Authority, that included an earthquake policy premium surcharge.

   **d.** We will not refuse to renew such coverage solely because corrosive soil conditions exist on the premises. This restriction **(d.)** applies only if coverage is subject to one of the following, which exclude loss or damage caused by or resulting from corrosive soil conditions:

      **(1)** Commercial Property Coverage Part – Causes Of Loss – Special Form; or

      **(2)** Farm Coverage Part – Causes Of Loss Form – Farm Property, Paragraph **D.** Covered Causes Of Loss – Special.

3. We are not required to send notice of nonrenewal in the following situations:

   **a.** If the transfer or renewal of a policy, without any changes in terms, conditions or rates, is between us and a member of our insurance group.

Unofficial copy from I.S.O. District Clerk et al L. Pace

**b.** If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **C.1.**

**c.** If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

**d.** If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

**e.** If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

**f.** If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in Paragraph **C.1.**, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

© Insurance Services Office, Inc., 2012   **IL 02 70 09 12**

APP 0575

POLICY NUMBER: I08909726 001                                                                    IL 09 53 01 08

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

SCHEDULE

The Exception Covering Certain Fire Losses (Paragraph C) applies to property located in the following state(s), if covered under the indicated Coverage Form, Coverage Part or Policy:

| State(s) | Coverage Form, Coverage Part Or Policy |
|---|---|
| CA | Construction Risk Coverage Form ACE0728 (10/13) |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A.** The following definition is added with respect to the provisions of this endorsement:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.** The following exclusion is added:

**CERTIFIED ACT OF TERRORISM EXCLUSION**
We will not pay for loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**C. Exception Covering Certain Fire Losses**
The following exception to the exclusion in Paragraph **B**. applies only if indicated and as indicated in the Schedule of this endorsement. If a "certified act of terrorism" results in fire, we will pay for the loss or damage caused by that fire. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements which apply to those forms, or to the Legal Liability Coverage Form or the Leasehold Interest Coverage Form.

**D. Application Of Other Exclusions**
The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

           © ISO Properties, Inc., 2007

APP 0576



| **ACE American Insurance Company** |
|---|
| Insurance Company |
| **Manchester Austin, LLC** |
| Policyholder |
| **I08909726 001** |
| Policy Number |
| **ALLIANT INSURANCE SERVI** |
| Broker/Produce |

# POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE

You were notified that under the Terrorism Risk Insurance Act, as amended, that you have the right to purchase insurance coverage for losses resulting from acts of terrorism, *as defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury---in concurrence with the Secretary of State, and the Attorney General of the United States---to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW.  HOWEVER, SUCH POLICIES MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS.  UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE.  THE PREMIUM FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.**

**YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABIITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION.  IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, COVERAGE MAY BE REDUCED.**

You elected *NOT* to purchase terrorism coverage under the Act at the price indicated. ACCORDINGLY, WE WILL *NOT* PROVIDE THIS COVERAGE AND YOU DO NOT OWE THE ADDITIONAL PREMIUM FOR THAT COVERAGE INDICATED BELOW.

Terrorism coverage described by the Act under your policy was made available to you for additional premium in the amount of $ **25,782** , however you elected to decline such coverage.

TRIA15c (01/08)

Unofficial Copy Velva L. Price District Clerk Travis Co.



**ACE Producer Compensation
Practices & Policies**

ACE believes that policyholders should have access to information about ACE's practices and policies related to the payment of compensation to brokers and independent agents.  You can obtain that information by accessing our website at http://www.aceproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.

ALL-20887 (10/06)

APP 0578

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

 © ISO Properties, Inc., 2004

APP 0579

# ACE INLAND MARINE - IMPORTANT NOTICE
## <u>NOTIFICATION OF CLAIMS</u>

**To our Brokers/Agents-To Be Kept With Policy**

**What to do when Loss Occurs**:

1.  Upon knowledge of any occurrence likely to give rise to a claim hereunder, "you" must give immediate notice to :

    ACE USA Property Claims
    One Beaver Valley Road, Suite 4E
    Wilmington, Delaware 19803

    E-Mail: propertyfirstnotices@acegroup.com

    Fax: (302) 476-7855

    Phone: (800) 433-0385

2.  ACE Inland Marine claims <u>cannot</u> be processed through any other facility and must be reported as indicated above.

3.  Adjustors can <u>only</u> be assigned by or with the specific authorization of the ACE USA Property Claims Department

## ESCALATION CLAUSE ENDORSEMENT

| Named Insured<br>Manchester Austin, LLC | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>IMC | Policy Number<br>I08909726 001 | Policy Period<br>11/05/2014  To  08/05/2017 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**CONSTRUCTION RISK COVERAGE FORM**

The Sub-limit of Insurance for Physical LOSS to the INSURED PROJECT stated on the Declarations is considered an estimate.  Should any increase in the Estimated Completed Value of the INSURED PROJECT occur, the Sub-limit of Insurance for Physical LOSS to the INSURED PROJECT will automatically increase to reflect the change concurrently, subject to a maximum increase of <u>10</u>% of the original Sub-limit of Insurance stated on the Declarations. The Per OCCURRENCE Limit of Insurance stated on the Declarations will increase by the same amount.

This clause does not apply to other Sub-limits of Insurance, including Delay in Opening, if endorsed to this Policy, nor does it apply to the Annual Aggregate Sub-limits of Insurance.

The NAMED INSURED must report the increase in value to the Company within 90 days of it being known to the NAMED INSURED and pay an additional premium at the rates stated elsewhere in this Policy.

All other terms and conditions remain unchanged.

Unofficial copy Travis Co. District Clerk Velva L. Price

## ORDINANCE OR LAW COVERAGE ENDORSEMENT

| Named Insured Manchester Austin, LLC | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol IMC | Policy Number I08909726 001 | Policy Period 11/05/2014  To  08/05/2017 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) ACE American Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**CONSTRUCTION RISK COVERAGE FORM**

**PART C EXTENSIONS OF COVERAGE**, Item 13 is deleted in its entirety and replaced by the following:

13.  Ordinance or Law

If the repair of direct physical LOSS to insured property caused by an insured peril becomes subject to the enforcement of any ordinance or law that is in force at the time of direct physical LOSS and that:

A.  Requires the demolition of parts of the undamaged insured property; or

B.  Regulates the construction or repair of damaged insured property;

then the Company will pay up to the Sub-limits of Insurance stated below for:

1.  The value of such undamaged part of the insured property which must be demolished;

2.  The cost of demolishing the undamaged insured property and clearing the site of debris from such demolition;

3.  The increased cost of repair and/or reconstruction of the damaged and undamaged insured property on the same site and limited to the minimum requirements of such ordinance or law regulating the repair or reconstruction of the damaged insured property on the same site.  However, the Company will not pay for any increased cost of repair or reconstruction unless the damaged insured property is actually rebuilt or replaced.

The Company will not pay the following costs:

i.  Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any ordinance or law regulating asbestos or other hazardous material;

ii.  Cost of any governmental direction or request declaring that asbestos or other hazardous material present in, part of or utilized on any damaged or undamaged portion of insured property that can no longer be used for the purpose for which it was intended or installed and must be removed, modified or abated.

iii.  Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any ordinance or law regulating CONTAMINANTS OR POLLUTANTS; or

iv.  Cost of compliance with the enforcement of any ordinance or law which the NAMED INSURED or owner would have otherwise been required to comply by nature of such ordinance or law in the absence of any direct physical LOSS covered by this Policy.

ACE0769 (10/13)                    Copyright 2013                    Page 1 of 2
APP 0582

**Sub-limits of Insurance**

These Sub-limits of Insurance are part of and not in addition to the Limit of Insurance per OCCURRENCE stated on the Declarations.

COVERAGE 1.         $Included

COVERAGE 2.         $50,000,000

COVERAGE 3.         $50,000,000

All Ordinance or Law Coverages in any one OCCURRENCE $ Included

All other terms and conditions remain unchanged.

# SIGNATURES

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Manchester Austin, LLC | | | |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| IMC | I08909726 001 | 11/05/2014 **to**  08/05/2017 | |
| Issued By (Name of Insurance Company) | | | |
| ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA** (A stock company)
**BANKERS STANDARD FIRE AND MARINE COMPANY** (A stock company)
**BANKERS STANDARD INSURANCE COMPANY** (A stock company)
**ACE AMERICAN INSURANCE COMPANY** (A stock company)
**ACE PROPERTY AND CASUALTY INSURANCE COMPANY** (A stock company)
**INSURANCE COMPANY OF NORTH AMERICA** (A stock company)
**PACIFIC EMPLOYERS INSURANCE COMPANY** (A stock company)
**ACE FIRE UNDERWRITERS INSURANCE COMPANY** (A stock company)
**WESTCHESTER FIRE INSURANCE COMPANY** (A stock company)

436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106-3703

*Rebecca L. Collins*
REBECCA L. COLLINS, Secretary

*[signature]*
JOHN J. LUPICA, President

_____
Authorized Representative

Unofficial copy Travis Co. District Clerk Velva L. Price